CHIEF JUSTICE RABNER delivered the opinion of the Court.
**217 *232 This appeal raises issues about the process law enforcement officers must follow when they ask eyewitnesses to try to identify a suspect. When officers conduct an identification procedure, they should exercise great care to avoid sending signals that could alter a witness' memory and lead to a mistaken identification. They must also document the process.
The case involves an armed robbery. The victim's identification of one of his assailants was the only evidence that led to defendant's conviction. When the witness first identified defendant from a photo array, an officer memorialized certain details about the process on three pre-printed forms. The officer did not record the process electronically or prepare a contemporaneous, verbatim written account of what took place.
The three forms were meant to follow existing case law. See State v. Delgado, 188 N.J. 48, 63, 902 A.2d 888 (2006). But they did not capture the entire dialogue between the witness and the officer and did not recount the witness' statement of confidence in his own words. Defendant also contends that there is no detailed summary of the exchange the victim had with a detective who **218 asked him to come to the police station to view the array. All of those items are required by a court rule that instructs law enforcement how to record out-of-court identification procedures, like a lineup or photo array. See R. 3:11(c).
Before trial, defendant asked for a pretrial hearing to explore the admissibility of the identification. The trial court denied the request in accordance with State v. Henderson, 208 N.J. 208, 288-89, 27 A.3d 872 (2011), because defendant could not present evidence of suggestiveness on the part of law enforcement from the existing record.
The appeal thus poses questions about the precise meaning and scope of Rule 3:11 as well as the proper remedies when Delgado and the Rule are violated. In response, today's ruling addresses the following points: (1) it clarifies Rule 3:11 and emphasizes that law enforcement officers are to record identification procedures electronically, preferably by video, if feasible; (2) it requires officers to document their reasons for not recording an identification procedure electronically or preparing a contemporaneous, verbatim written account of the process; (3) it modifies Henderson and holds that defendants are entitled to a pretrial hearing on the admissibility of a witness' identification when no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared, even without evidence of suggestiveness on the part of law enforcement; and (4) it proposes a change to the model jury charge for use when Delgado and Rule 3:11 are not followed.
Because the Rule was not fully followed here, and because we cannot tell from the record whether the shortcomings were technical or substantive in nature, we remand for a full hearing consistent with United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and Henderson. Based on the evidence developed at the hearing, the trial court will be in the best position to determine whether a new trial is warranted.
*233 **219 I.
Between 2 and 3 a.m. on December 18, 2012, Eugene Roberts pulled into the driveway of his home in Newark. The area was well-lit by nearby streetlights and two motion-detector lights on his garage. As Roberts got out of his car, three men in their twenties approached him. None of them wore masks. Roberts turned around and looked at their faces from three to five feet away.
One of the men pointed a revolver at Roberts' torso and demanded money. When Roberts said he had none, the gunman demanded his wallet. Roberts handed the wallet to another man, who confirmed it had no money inside. The third man, later identified as defendant Ibnmauric Anthony, then asked for Roberts' car keys. From an arm's length away, Roberts looked at the third man and handed over his keys. The man entered the car and searched the glove compartment and under the front and rear seats. The interior dome light was on while he searched, and Roberts watched as the man rifled through the car.
Immediately after the search, the gunman told Roberts to get on his knees and face the car. Roberts complied. The gunman then put the revolver to Roberts' head and said, "I ought to kill you." Roberts testified that he remained calm, based on his training in the Marine Corps years before.
Next, the man who searched the car tossed the keys to the ground, and all three walked away. They threatened to shoot Roberts if he turned around. Roberts nonetheless glanced over his shoulder and saw them get into a gray car and drive away. Roberts estimated that the entire incident lasted about seven to eight minutes.
Roberts then entered his home, told his wife what happened, and called the police. Soon after, officers arrived and took Roberts to the police station where he gave a statement. Roberts described the height, hairstyle, and clothing of each assailant. He said the man who searched his car was thin, 5'11?, wore light-colored **220 clothing, and sported "dreads." Roberts did not describe the assailant's complexion, eye color, or the shape of his face.
Two days later, Detective Pablo Gonzales called Roberts and asked him to return to the police station to look at a photo array. The Detective had prepared an array of six photos of men with dreadlocks. The array included a photo of defendant taken one year before.
Detective Karima Hannibal administered the array. She was not involved in the case and did not know the suspect's identity. Detective Hannibal read a series of instructions to Roberts, showed him the array, and recorded his response. She used three pre-printed Newark Police Department forms to document the identification procedure.
Detective Hannibal testified that she first read the "Photo Display Instructions" form aloud, which both she and Roberts then signed. Roberts confirmed that he reviewed the instructions. The instructions sheet contained the following information:
In a moment, I will show you a number of photographs one at a time. You may take as much time as you need to look at each of them. You should not conclude that the person who committed the crime is in the group merely because a group of photographs is being shown to you. The person who committed the crime may or may not be in the group, and the mere display of the photographs is not meant to suggest that the police believe that the person who committed the crime is in one of the photographs.
*234 You do not have to select any photograph.
... Tell me immediately if you recognize anyone in one of the photographs.
....
If you select a photograph, please do not ask me whether I agree with or support your selection. I do not know who[ ] the suspect is, if they are in the line up, or what photograph he/she may be present. It is your choice alone that counts.
Roberts selected the third photo -- a photo of defendant -- and wrote the following by hand on the "Photograph Identification Form": "# 3" was "[t]he man who ask[ed] me for my car keys during the robbery." Roberts signed the form underneath the following statement:
Det. K. Hannibal of the Newark Police Department is the person who asked me to view these photographs. Neither he/she nor anyone else used any threats or promises, urged or prompted me in any way to cho[o]se any of the aforementioned photographs. I have been given an opportunity to read this form (or had it read to **221 me) and have been asked to sign my name to it, if the contents are the truth to the best of my knowledge and belief.
Detective Hannibal also completed a third form, a "Photo Display Report." In a section marked "Comments and Demeanor of Witness," she wrote that Roberts was "confident in his choice." She also checked a box to note that he did not "ask to see any photos again." At trial, Detective Hannibal told the jury the same thing: that Roberts "was calm and confident in the choice that he made." Roberts likewise testified that he did not feel pressured to select a photo and "was very confident" in his selection.
A grand jury in Essex County indicted defendant and charged him with four offenses: second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2, 15-1(b) (count one); first-degree armed robbery, N.J.S.A. 2C:15-1 (count two); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three); and second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four).
Defendant moved to suppress the out-of-court identification and asked for a pretrial hearing under Wade and Henderson. Among other points, defendant argued that it was improper under Delgado for law enforcement officers not to memorialize or record the dialogue between Roberts and Detective Hannibal during the viewing of the photo array. Without that information, defendant claimed, there was no way to know if any impermissibly suggestive behavior took place.
The trial court denied defendant's motion and request for a pretrial hearing. The court explained that defendant had not presented evidence of suggestiveness tied to a system variable -- that is, a variable within the control of law enforcement. See Henderson, 208 N.J. at 283, 27 A.3d 872. The court also found that Detective Hannibal's pre-identification instructions ensured that Roberts' "identification was, in fact, his own" and not the product of suggestive behavior by law enforcement. The court concluded the identification was admissible.
**222 Trial began on May 14, 2015. Roberts testified about the robbery and identified defendant in court. Detectives Gonzales and Hannibal also testified, as did an officer who responded to the scene. Defendant presented a defense investigator who had interviewed Roberts. The investigator's testimony suggested that Roberts had made inconsistent statements about the *235 robbery and his assailants, which Roberts disputed.
The case rested on Roberts' identification. The prosecution introduced no physical or other corroborative evidence that linked defendant to the robbery.
To instruct the jury, the trial court used the model jury charge for eyewitness identification, Model Jury Charges (Criminal), "Identification: In-Court and Out-of-Court Identifications" (rev. July 19, 2012) (Identification Charge). The charge to the jury included guidance on the witness' opportunity to view the assailant; the effects of stress, duration, weapon focus, distance, lighting, and changed appearance; prior descriptions; and time elapsed. The charge also contained cautionary language on how to assess a witness' stated level of confidence:
Although nothing may appear more convincing than a witness' categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, when analyzing such testimony, be advised that a witness' level of confidence, standing alone, may not be an indication of the reliability of the identification.
The court returned to this theme soon after and added, "[a]lthough some research has found that highly confident witnesses are more likely to make accurate identifications, eyewitness confidence is generally an unreliable factor of accuracy."
The charge also told jurors to consider whether the out-of-court-identification "was the result of a suggestive procedure." On that subject, the court offered instructions on lineup composition, fillers, double-blind administration, and pre-identification advice.
Defendant did not object to the charge. Nor did he ask for a supplemental charge about the administration or recording of the photo array.
**223 The jury convicted defendant on all counts on May 22, 2015. The trial court later sentenced defendant to a seventeen-year term on count two, with an eighty-five percent parole disqualifier, and merged counts one and four. Defendant was sentenced to a concurrent nine-year term on count three.
Defendant appealed, and the Appellate Division affirmed his conviction. He raised two claims that are relevant to this appeal. First, he claimed the out-of-court identification should have been inadmissible because the police failed to record, in Roberts' own words, his statement of confidence. Second, he argued it was plain error for the court not to instruct the jury about that circumstance.
The Appellate Division disagreed. It found
no hint or suggestion anywhere in this record that anyone prompted or influenced Roberts in any way to select defendant's photograph. Most importantly, with respect to the recordation deficiency asserted by defendant, there is no evidence or suggestion that after making the identification, Roberts was subjected to any positive feedback that might have had the capacity to distort his confidence level, this being the primary purpose of the requirement for recording the witness' actual words expressing confidence.
Looking at the record as a whole, the panel concluded that "the failure to record Roberts' actual words" of confidence was not "a sufficient violation (if a violation at all) of Delgado and Rule 3:11 to warrant exclusion of the evidence." Any error, in the panel's judgment, "was harmless in the overall circumstances of this case."
*236 The Appellate Division also rejected defendant's belated challenge to the jury charge. The panel observed that "[a] contemporaneous written record was made" and "[t]he identification charge given was thorough and correct." Under the circumstances, the panel did not find that the absence of a supplemental charge had "a clear capacity to bring about an unjust result."
We granted certification "limited to the issue of the State's failure to comply with the requirements of" Delgado. 231 N.J. 110, 171 A.3d 1263 (2017). We also granted leave to the Attorney **224 General and the American Civil Liberties Union of New Jersey (ACLU) to appear as amici curiae.
II.
Defendant contends that the admission of the out-of-court identification, despite the failure of the police to comply with Delgado and Rule 3:11, denied him a fair trial. Defendant argues that the police unjustifiably failed to record the identification procedure electronically, failed to provide a verbatim account of the complete dialogue between the officers and Roberts, and did not record Roberts' statement of confidence in his own words, as required. Defendant submits that the wrongful admission of the identification evidence tainted the trial and amounted to harmful error. He claims he is entitled to be retried without the identification evidence.
In the alternative, defendant argues his conviction should be reversed because the failure to provide the jury with a cautionary charge was plain error. Defendant adds that Rule 3:11 should be amended to require video recording when feasible, and to provide for a cautionary instruction whenever there is no video record.
The ACLU advances similar arguments. It contends that the State's failure to contemporaneously record the out-of-court identification violated this Court's precedents and the rules of court and requires that defendant's conviction be reversed.
The State argues that the trial court properly admitted Roberts' out-of-court identification because there was no evidence of suggestiveness in the identification procedure and the identification was reliable. The State contends that the three forms the police used satisfied Delgado and Rule 3:11. The State further submits that the trial court properly declined to hold a pretrial hearing because defendant failed to offer some evidence of suggestiveness. Because the identification was nevertheless reliable, the State contends, any error was harmless.
**225 The State also argues that the trial court gave an appropriate instruction on how to evaluate Roberts' identification of defendant and that any error did not rise to the level of plain error. Finally, the State claims this Court should decline to consider defendant's request to amend Rule 3:11 and that the suggested amendment is not needed because the Rule already allows for electronic recordation when feasible.
The Attorney General agrees that the trial court properly admitted Roberts' out-of-court identification because there was nothing suggestive in the identification procedure. In such a case, the Attorney General argues, to suppress a reliable identification because the witness' exact language was not documented would amount to a per se bar and would frustrate the truth-seeking function of the criminal justice system.
III.
A.
Henderson explored the subject of eyewitness identification at length. The opinion *237 observed that "memory is malleable" and noted that relevant scientific evidence "revealed a troubling lack of reliability in eyewitness identifications." 208 N.J. at 218, 27 A.3d 872. The Court acknowledged that "eyewitness misidentification is the leading cause of wrongful convictions across the country." Ibid.
Henderson reviewed the social science research and assessed "an array of variables [that] can affect and dilute memory and lead to misidentifications." Ibid. Those factors include (1) "system variables" that are within the control of law enforcement, like lineup procedures and feedback, and (2) "estimator variables" that the legal system does not control, like lighting conditions, stress, and memory decay. Ibid.
In the end, the Court concluded that the then-prevailing standard to assess eyewitness identifications -- the test derived from **226 Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), and State v. Madison, 109 N.J. 223, 536 A.2d 254 (1988) -- did "not offer an adequate measure for reliability or sufficiently deter inappropriate police conduct." Henderson, 208 N.J. at 218, 27 A.3d 872. The Court therefore revised the legal framework for the admission of eyewitness identification evidence. Henderson held that when defendants can show some evidence of suggestiveness tied to a system variable, they are entitled to explore all relevant system and estimator variables at a pretrial hearing to try to challenge the admissibility of the identification. Id. at 288-93, 27 A.3d 872.
Confirmatory feedback is one of a number of variables that can affect memory. Studies have shown that positive feedback can distort memory and "create a false sense of confidence." Id. at 255, 27 A.3d 872. That is a significant concern because of how much weight jurors place on the level of confidence a witness displays at trial. Id. at 274, 27 A.3d 872. As the Court observed in State v. Romero, "[j]urors likely will believe eyewitness testimony 'when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all.' " 191 N.J. 59, 75, 922 A.2d 693 (2007) (quoting Watkins v. Sowders, 449 U.S. 341, 352, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting) ). It is thus critical for law enforcement to record a witness' full statement of confidence when an identification is first made -- before any possible feedback. Henderson, 208 N.J. at 254, 27 A.3d 872 ; see also Delgado, 188 N.J. at 63, 902 A.2d 888.
The framework the Court adopted in Henderson"avoid[ed] bright-line rules that would lead to suppression of reliable evidence any time a law enforcement officer [made] a mistake." 208 N.J. at 303, 27 A.3d 872. The Court recognized that in most cases, identifications will be presented to the jury because the threshold for suppression is high. Ibid. Defendants must show "a very substantial likelihood of irreparable misidentification." Id. at 289, 27 A.3d 872 (citing Manson, 432 U.S. at 116, 97 S.Ct. 2243 ). As a result, the Court addressed the need to educate jurors with **227 enhanced jury charges "about factors that can lead to misidentifications." Id. at 303, 27 A.3d 872.
B.
Central to this appeal is a consistent line of precedential rulings on the need to make a record of an identification procedure. The decisions specify what law enforcement officers must preserve.
In 1972, the Court found that "counsel need not be present" at a pre-indictment identification procedure. State v. Earle, 60 N.J. 550, 552, 292 A.2d 2 (1972). The Court added that
*238 enforcement authorities should nonetheless make a complete record of an identification procedure if it is feasible to do so.... The identity of persons participating in a [live] lineup should be recorded, and a picture should be taken if it can be. If the identification is made or attempted on the basis of photographs, a record should be made of the photographs exhibited. We do not say a failure hereafter to follow such procedures will itself invalidate an identification, but such an omission, if not explained, should be weighed in deciding upon the probative value of the identification, out-of-court and in-court.
[ Ibid. ]
The Court went further in Delgado. It exercised its supervisory powers under the State Constitution "to require that, as a condition to the admissibility of an out-of-court identification, law enforcement officers make a written record detailing the out-of-court identification procedure, including the place where the procedure was conducted, the dialogue between the witness and the interlocutor, and the results." 188 N.J. at 63, 902 A.2d 888. Delgado stressed that "[p]reserving the words exchanged ... may be as important as preserving" a picture of a live lineup or an array. Ibid."When feasible, a verbatim account of any exchange between the law enforcement officer and witness should be reduced to writing. When not feasible, a detailed summary of the identification should be prepared." Ibid. [1]
**228 Delgado encouraged but did not mandate the use of tape recorders to preserve identification procedures. Ibid. In addition, the Court asked the Criminal Practice Committee to prepare a rule to incorporate the above principles. Id. at 64, 902 A.2d 888.
In Henderson, the Court reaffirmed Delgado and noted that, "[o]f course, all lineup procedures must be recorded and preserved in accordance with" Delgado's holding. 208 N.J. at 252, 27 A.3d 872. To guard against confirmatory feedback, the Court again exercised its supervisory power to require law enforcement to record a witness' statement of confidence "in the witness' own words before any possible feedback.... [O]fficers should make a full record -- written or otherwise -- of the witness' statement of confidence once an identification is made." Id. at 254, 27 A.3d 872.
Henderson added that "if an eyewitness' confidence was not properly recorded soon after an identification procedure, and evidence revealed that the witness received confirmatory feedback," trial judges could bar any testimony at trial about the witness' level of confidence. Id. at 298, 27 A.3d 872.
C.
In Henderson, the Court asked the Criminal Practice Committee and the Committee on Model Criminal Jury Charges to revise the charge on eyewitness identification. Ibid. The Court adopted an enhanced set of instructions in 2012. See Identification Charge. The charge addresses general concerns about eyewitness identifications and includes instructions about particular variables that should be used if they apply in a given case. Ibid. As noted earlier, the trial judge here relied on the model charge and instructed *239 the jury about multiple relevant factors.
D.
In response to Delgado and Henderson, the Criminal Practice Committee in 2012 proposed a court rule on recording requirements **229 for identification procedures. Report of the Supreme Court Criminal Practice Committee on Revisions to the Court Rules Addressing Recording Requirements for Out-of-Court Identification Procedures and Addressing the Identification Model Charges App. A (Feb. 2, 2012). The Court adopted Rule 3:11 later the same year. See R. 3:11 ("Record of an Out-of-Court Identification Procedure").
Section (a) provides that "[a]n out-of-court identification resulting from a photo array, live lineup, or showup identification procedure conducted by a law enforcement officer shall not be admissible unless a record of the identification procedure is made."
Section (b) speaks to the method of recording and reads as follows:
A law enforcement officer shall contemporaneously record the identification procedure in writing, or, if feasible, electronically. If a contemporaneous record cannot be made, the officer shall prepare a record of the identification procedure as soon as practicable and without undue delay. Whenever a written record is prepared, it shall include, if feasible, a verbatim account of any exchange between the law enforcement officer involved in the identification procedure and the witness. When a written verbatim account cannot be made, a detailed summary of the identification should be prepared.
Section (c) specifies what the record should include. Among other items, it should detail
(2) the dialogue between the witness and the officer who administered the procedure;
....
(7) a witness' statement of confidence, in the witness' own words, once an identification has been made; and
(8) the identity of any individuals with whom the witness has spoken about the identification, at any time before, during, or after the official identification procedure, and a detailed summary of what was said. This includes the identification of both law enforcement officials and private actors who are not associated with law enforcement.
If the record "is lacking in important details ... and if it was feasible [for law enforcement] to obtain and preserve those details," the Rule identifies the following three remedies: the trial "court may, in its sound discretion and consistent with appropriate case law, declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury **230 charge to be used in evaluating the reliability of the identification." R. 3:11(d).
IV.
The parties debate the meaning of different parts of the Rule, and their dispute highlights ways in which it can be clarified and strengthened.[2]
Prior case law calls for electronic recording of identification procedures, if *240 feasible. See Delgado, 188 N.J. at 63, 902 A.2d 888 ("electronic recordation is advisable"). The current court rule follows that approach. It favors electronic recording and verbatim written recordings, both of which are superior to detailed written summaries. See R. 3:11(b).
With the proliferation of recording devices in recent years, the Rule's aim is easier to achieve today than in the past. Police departments of all sizes now have access to devices that can electronically record and preserve identification procedures. And departments already use recording equipment to investigate crimes. For more than a decade, law enforcement has been required to record electronically all custodial interrogations at a police station when the person being questioned is charged with murder, kidnapping, aggravated manslaughter, robbery, aggravated sexual assault, burglary, aggravated arson, crimes involving the possession or use of a firearm, and other offenses. See R. 3:17(a); see also State v. Hubbard, 222 N.J. 249, 263, 118 A.3d 314 (2015). In such cases, a recording must be made unless it is not feasible to do so or another exception applies. R. 3:17(b).
Electronic recordings are preferable for identification procedures as well. Audio captures not only the words spoken between **231 an administrator and an eyewitness but also tone, and video preserves expressions or gestures as well. (In this opinion, the term "video" refers to audio-visual recordings.) That type of information can help the trial judge and the jury accurately assess witness confidence, any feedback, and the overall reliability of an identification -- and thus help guard against mistaken identifications.
To more clearly state the order of preference for preserving an identification procedure, Rule 3:11(b) should be revised along the following lines: Officers are to record all identification procedures electronically in video or audio format. Preferably, an audio-visual record should be created. If it is not feasible to make an electronic recording, officers are to contemporaneously record the identification procedure in writing and include a verbatim account of all exchanges between an officer and a witness. If a contemporaneous, verbatim written account cannot be made, officers are to prepare a detailed summary of the identification as soon as practicable.
In stating a preference for video over audio recordings, we note that various organizations and entities have recommended that approach. See Nat'l Acad. of Scis., Identifying the Culprit: Assessing Eyewitness Identification 108-09 (2014) ("[V]ideotaping ... is necessary to obtain and preserve a permanent record of the conditions associated with the initial identification."); Int'l Ass'n of Chiefs of Police, Model Policy: Eyewitness Identification 2 (2010); Office of the Att'y Gen., Wis. Dep't of Justice, Model Policy and Procedure for Eyewitness Identification 14 (2010); Am. Bar Ass'n, Best Practices for Promoting the Accuracy of Eyewitness Identification Procedures 3 (2004); see also Office of the Attorney General, Photo Array Eyewitness Identification Procedure Worksheet 1 (Oct. 1, 2012) (Photo Array Worksheet) (noting that video recordings can be "used to record/document the ID procedure"), https://www.state.nj.us/lps/dcj/agguide/Eye-ID-Photoarray.pdf.
North Carolina and Illinois already require law enforcement officers to make an electronic recording of identification procedures, **232 if practical. See N.C. Gen. Stat. 15A-284.52(b)(14) (requiring a video record or, if not practical, an audio record of live identification procedures); 725 Ill. Comp. Stat. Ann. 5/107A-2(f)(10) (requiring an audio or video recording of all lineup *241 procedures when practicable). When no electronic recording is made, both states also require officers to document the reasons why. See N.C. Gen. Stat. 15A-284.52(b)(14) ("If neither a video nor audio record are practical, the reasons shall be documented, and the lineup administrator shall make a written record of the lineup."); 725 Ill. Comp. Stat. Ann. 5/107A-2(h) ("If a video record is not practical or the eyewitness refuses to allow a video record to be made ... the reasons or the refusal shall be documented .... If an audio record is not practical, the reasons shall be documented ....").
That sensible approach informs courts and defendants about a key part of the eyewitness identification process and provides important context to evaluate what occurred. Perhaps investigators accommodated a fearful witness who would not speak if recorded electronically; maybe a recording device malfunctioned; or, maybe an officer failed to follow mandatory procedures without a sound reason.
We rely on our supervisory powers under Article VI, Section 2, Paragraph 3 of the State Constitution to require a similar practice. See Henderson, 208 N.J. at 254, 27 A.3d 872 ; Delgado, 188 N.J. at 63, 902 A.2d 888. When it is not feasible to make an electronic recording of an identification procedure, law enforcement officers must document the reasons for not having done so. The same requirement applies when officers cannot prepare a contemporaneous, verbatim written account.
We ask the Criminal Practice Committee to revise Rule 3:11 consistent with the above principles.
V.
As noted earlier, Henderson outlined the legal standard for when courts should hold pretrial hearings. The ruling also led to **233 enhanced jury charges on identification evidence to help juries evaluate evidence presented at trial. 208 N.J. at 298-99, 27 A.3d 872. The circumstances of this case require that we revisit both subjects.
A.
To obtain a pretrial hearing, a defendant must present some evidence of suggestiveness tied to a system variable which could lead to a mistaken identification. Id. at 288-89, 27 A.3d 872. Under that standard, proof that an administrator offered positive feedback to a witness after an identification would justify a hearing. Because even a seemingly innocuous comment can falsely inflate a witness' confidence and contribute to a mistaken identification -- for example, simply telling a witness that he or she did a "good job," id. at 291, 27 A.3d 872 -- a hearing would be warranted under those circumstances.
If a law enforcement officer does not electronically record the identification procedure or prepare a contemporaneous verbatim account of the exchange, the defendant may not learn about confirmatory feedback or other suggestive behavior. Without that critical information, he or she may not be able to get a hearing under the current standard -- as happened in this case.
Stated another way, defendants need a full record of the identification procedure to gather possible evidence of suggestiveness. The failure to provide that information should not deprive defendants of the opportunity to probe about suggestive behavior that may have tainted an identification.
To address that situation, we modify the Henderson framework in this way: a defendant will be entitled to a pretrial hearing on the admissibility of identification evidence if Delgado and Rule 3:11 are *242 not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared. In such cases, defendants will not need to offer proof of suggestive behavior tied to a system variable to get a pretrial **234 hearing. This approach supplements the other remedies listed in Rule 3:11(d).
At the hearing, counsel will be free to explore the full range of variables discussed in Henderson, as they can in the ordinary course. 208 N.J. at 288-93, 27 A.3d 872. Counsel can thus inquire about feedback and witness confidence ahead of trial. If the identification evidence is then admitted, defense attorneys will not be left in the uncomfortable position of having to decide whether to ask speculative questions at trial about feedback, witness confidence, and other variables for which counsel do not have answers.
We do not suggest that a hearing would be appropriate in all cases. If the police present a record that is bereft of details and offers no reasonable explanation why a better record was not prepared, a court in its discretion could strike the identification evidence altogether without a hearing. See R. 3:11(d). What happened here, though, is different. As discussed further below, law enforcement officials made a record that contained significant details but also left out important information.
B.
We turn next to the appropriate jury charge for a violation of Rule 3:11. Section (d) of the Rule addresses the remedies a court can craft when the record of an identification procedure "is lacking in important details." To reiterate, the Rule empowers the court, "in its sound discretion and consistent with appropriate case law," to "declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification." Ibid.
The current model jury charge on eyewitness identification evidence offers guidance on the last point. It includes the following language on pre-identification instructions:
Identification procedures should begin with instructions to the witness that the perpetrator may or may not be in the array and that the witness should not feel compelled to make an identification. The failure to give this instruction can increase **235 the risk of misidentification. If you find that the police [did/did not] give this instruction to the witness, you may take this factor into account when evaluating the identification evidence.
[Identification Charge at 8 (citing Henderson, 208 N.J. at 250, 27 A.3d 872 ) (emphasis added).]
See also Model Jury Charges (Criminal), "Statements of Defendant (When Court Finds Police Inexcusably Failed to Electronically Record Statement)" (R. 3:17) (Nov. 7, 2005) ("Among the factors you may consider in deciding whether or not the defendant actually gave the alleged statement and if so, whether any or all of the statement is credible, is the failure of law enforcement officials to make an electronic recording of the interrogation conducted ....").
Similar language can be used to instruct a jury about the failure to preserve an identification procedure. In such cases, jurors should be told that officers are required to record identification procedures electronically; if that is not feasible, they are required to prepare a contemporaneous, verbatim written account of the procedure. If the police did not follow that practice, and, for example, did not capture the dialogue between the witness and the *243 officer, or record a statement of confidence in the witness' own words, the jury may take that into account when it evaluates the identification evidence.
Counsel should request such a charge when the facts warrant it. We ask the Model Jury Charge Committee to amend the model charge accordingly.
VI.
In this case, the officers did not comply with Rule 3:11 or Delgado in full. They did not prepare an electronic recording of Roberts' out-of-court identification of defendant. They also did not prepare a contemporaneous, verbatim written account of the exchange between Roberts and the officer who administered the photo array.
**236 The police instead used three forms that documented important information about the process. The forms, along with other parts of the record, reveal that the photo array itself was proper; a blind administrator conducted the identification; she gave thorough and correct pre-identification instructions to the witness; and he acknowledged that he understood them. One form contains the witness' words, in his own handwriting, about the person he identified -- "[t]he man who ask[ed] me for my car keys during the robbery." The identity of the officer who administered the identification, and the location where the procedure took place, are also documented. See R. 3:11(c)(1)-(3), (6).
Reliance on the forms alone, though, did not create an adequate record in other respects. There is no electronic recording or contemporaneous, verbatim written account of the exchange during the identification procedure. See R. 3:11(b). As a result, the record does not reveal the full dialogue between Detective Hannibal and Roberts. See R. 3:11(c)(2). We also cannot tell whether the written statement of confidence reflected the witness' own words. See R. 3:11(c)(7). Nor is it clear whether the record contains the full extent of the conversation between Detective Gonzales and Roberts when the officer asked the witness to come to the police station to view the array. R. 3:11(c)(8).[3]
**237 To be sure, Detective Hannibal, a "blind administrator" who did not know which photo depicted the suspect, could not have confirmed whether Roberts selected "the right" photo. But without a recording of the full exchange, or an opportunity to explore it at a hearing, it was not possible to know ahead of trial whether more subtle positive feedback was given, even if well-meaning. Similar concerns potentially apply to the conversation between Detective Gonzales and Roberts, for which the record does not contain a detailed summary consistent with Rule 3:11(c)(8).
The trial court found that defendant had not presented any evidence of suggestiveness *244 tied to a system variable and therefore declined defendant's request for a pretrial hearing on Roberts' identification. That ruling likely carried over to the trial. Although the officers and Roberts responded to questions at trial about what happened before and during the photo array, neither the prosecutor nor the public defender asked about confirmatory feedback. The public defender likely did not know what the answers would have been.
The State contends that any shortcomings were simply technical omissions. For example, the State represents that the statement on the "Photo Display Report" -- "confident in his choice" -- accurately summarized what Roberts said when he made the identification. Yet defendant had no chance to test that representation at a pretrial hearing. Similarly, the State argues there is no evidence of suggestiveness in the record. Once again, defendant counters that it is not possible to tell from an incomplete record whether Detectives Gonzales or Hannibal made suggestive comments when they separately spoke with Roberts.
Under the circumstances, perhaps the best option was one not available at the time: a hearing to assess the reliability of the identification even though defendant could not present evidence of suggestiveness. A hearing would have benefitted not only defendant but also the trial court, by enabling it to fulfill its gatekeeping role.
**238 As in Henderson and Chen, we remand this case to the trial court for such a hearing. See Henderson, 208 N.J. at 300, 27 A.3d 872 ; State v. Chen, 208 N.J. 307, 329, 27 A.3d 930 (2011). Defendant can explore all relevant variables, including confirmatory feedback and witness confidence, at the hearing. When the record is fully developed, the trial court will be in the best position to determine (1) whether the identification evidence was admissible, and (2) if it was, whether defendant was harmed by the lack of a pretrial hearing and the absence of a jury charge to explain that Delgado was not followed in full.
At this time, without a more complete record, we do not find that the absence of a supplemental charge was plain error. See R. 2:10-2. The trial judge carefully relied on the model jury charge and provided extensive instructions on how to assess the identification evidence. The charge included cautionary language about witness confidence, quoted above.[4]
Defendant did not object to the charge. Although Rule 3:11(d) allows for a supplemental charge to be fashioned, defendant did not ask for one. Any error in the charge therefore must "have been clearly capable **239 of producing an unjust result" to warrant a new trial. R. 2:10-2.
Defendant will have an opportunity to challenge the verdict on remand. If damaging evidence about feedback, witness confidence, or some other factor that affects memory is developed at the hearing, he may have a strong case and be entitled to a new trial. On the other hand, if it turns out that the police essentially tracked Roberts' full statement of confidence on the photo display report form and offered no confirmatory feedback, defendant may face an uphill climb. In such a case, he would be hard-pressed to show that a technical violation of Rule 3:11(d) was "clearly capable of producing an unjust result." R. 2:10-2. We express no view on the outcome of the hearing.
*245 We reject defendant's argument that the identification should be barred for all purposes at this time because the police failed to fully abide by Rule 3:11. That would amount to a per se rule that any error in recording an identification, even a technical or insignificant one that presents a low risk of misidentification, requires suppression of the evidence.
That is not the path this Court has followed for good reason. See Henderson, 208 N.J. at 303, 27 A.3d 872. The case law in this sensitive area is designed to guard against unreliable identification evidence in order to protect the accused. We have not, however, created bright-line rules that call for the "suppression of reliable evidence any time a law enforcement officer makes a mistake." Ibid. With that in mind, the remand hearing in this matter should probe what happened during the identification process -- and end with evidence being excluded if it is unreliable, and admitted otherwise.
We recognize that, in the final analysis, "[t]he threshold for suppression remains high." Ibid. Unless a defendant can show "a very substantial likelihood of irreparable misidentification," id. at 289, 27 A.3d 872 (citing Manson, 432 U.S. at 116, 97 S.Ct. 2243 ), it is for the jury to decide whether to credit a witness' account, with the benefit of the augmented model jury charge. In this case, once again, the trial court will assess that standard in light of what is developed at the remand hearing. At that point, the trial court will also be able to consider whether the lack of a pretrial hearing and absence of a jury charge warrant a new trial.
VII.
For the reasons outlined above, we remand this case to the trial court for further proceedings consistent with this opinion.
JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, SOLOMON and TIMPONE join in CHIEF JUSTICE RABNER's opinion. JUSTICE ALBIN filed an opinion, dissenting in part.
JUSTICE ALBIN, dissenting in part.
**240 I applaud the Court for the steps taken in this opinion to reaffirm its commitment to our decisions in State v. Delgado, 188 N.J. 48, 902 A.2d 888 (2006), and State v. Henderson, 208 N.J. 208, 27 A.3d 872 (2011), and to improve and tighten Rule 3:11. This Court has been at the forefront of demanding that the police adhere to procedures designed to ensure the reliability of the identification process and that judges instruct jurors on the shortcomings of an eyewitness identification.
I dissent because, unlike my colleagues, I cannot conclude that Ibnmauric Anthony received a fair trial. The State's entire case rested on the reliability of the victim's identification. Yet, the police did not comply with Rule 3:11, which requires a contemporaneous recordation of the identification process so that a jury can determine for itself the reliability of the identification. The trial judge should have instructed the jury that a violation of Rule 3:11 -- a rule intended to preserve evidence for trial -- could be considered in assessing whether the State met its burden of proof. The failure to give that instruction deprived the jury of essential information necessary for the rendering of a proper verdict. I therefore would grant a new trial.
I.
Misidentification is "the single greatest cause of wrongful convictions in this country." Delgado, 188 N.J. at 60, 902 A.2d 888. According to a meta-analysis of multiple studies, fifteen percent of eyewitness identifications *246 resulted in the selection of an innocent person from a photographic lineup. Henderson, 208 N.J. at 255-56, 27 A.3d 872 (citing **241 Kenneth A. Deffenbacher et al., Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference, 30 Law & Hum. Behav. 287, 299 (2006) ). Data collected by the Innocence Project indicates that seventy percent of defendants exonerated based on DNA evidence were wrongly convicted as the result of some form of misidentification. Innocence Project, DNA Exonerations in the United States, https://www.innocenceproject.org/dna-exonerations-in-the-united-states (last visited Feb. 28, 2019). Those chilling statistics are a reminder of the frailty of human memory and of this Court's need to rigorously enforce the procedural protections already in place that safeguard the reliability of the identification process.
The criminal conviction in this case rests solely on the victim's identification of Anthony during a photographic lineup at police headquarters that violated the recording requirements mandated by Rule 3:11 and this Court's decisions in Henderson, 208 N.J. at 254, 27 A.3d 872, and Delgado, 188 N.J. at 63, 902 A.2d 888. No physical or other corroborating evidence supports the identification.
Our court rule required the police to "contemporaneously record the identification procedure in writing, or, if feasible, electronically," R. 3:11(b), including "the dialogue between the witness and the officer who administered the procedure," R. 3:11(c)(2), and the "witness' statement of confidence, in the witness' own words, once an identification has been made," R. 3:11(c)(7). That did not happen. In essence, the police failed to preserve potentially critical evidence. By failing to make a contemporaneous recordation, the police denied the jury the opportunity to learn whether the witness hesitated, had a hitch in his voice, or betrayed even the slightest doubt before he made a "confident" identification. A remand hearing six-and-a-half years later -- to determine suggestiveness or precisely what the witness said or how he said it -- should be one, not the sole, avenue of relief. A hearing so many years after the identification may not realistically or reliably recover what has been lost by the failure to audio- or video-record the process as it occurred.
**242 The trial judge had a remedy available commensurate with the violation of the Rule. The judge had the authority to "declare the identification inadmissible, redact portions of the identification testimony, and/or fashion an appropriate jury charge to be used in evaluating the reliability of the identification." R. 3:11(d).
In view of the violation of Rule 3:11, short of suppressing the identification -- a remedy I do not propose -- the judge had an independent obligation to instruct the jury that the police failed to adhere to the Rule's recordation requirement. The judge also should have advised the jury of its right to draw an adverse inference from the failure of the police to record the identification process, along with all the evidence, in determining whether the State met its burden of proving guilt beyond a reasonable doubt. The judge had the singular responsibility of instructing the jury correctly on the law -- even in the absence of a request by counsel -- given that the State's entire case hinged on the reliability of the identification. See State v. Green, 86 N.J. 281, 288, 430 A.2d 914 (1981) ("[W]e hold the view that a mandatory duty exists on the part of the trial judge to instruct the jury as to the fundamental principles of law which control the case[,] ... [a]nd the duty is not affected by the failure of a party to request that it be discharged."
*247 (quoting State v. Butler, 27 N.J. 560, 143 A.2d 530 (1958) ) ). The failure to do so constituted plain error. See R. 2:10-2.
II.
All human endeavors and undertakings are susceptible to error. We cannot remove the potential for error in our system of justice. We cannot eliminate mistaken identifications or wrongful convictions. We can, however, institute practices that will reduce the rate of error. That fifteen percent of eyewitness identifications result in misidentifications does not have to translate into an equal number of wrongful convictions. When a jury is properly informed of the shortcomings of eyewitness identification and of any shortcuts taken by law enforcement in the identification process, misidentifications will lead to fewer wrongful convictions.
**243 The court has an "independent duty" to explain clearly and accurately the law to the jury to ensure a fair trial. State v. Reddish, 181 N.J. 553, 613, 859 A.2d 1173 (2004) ; accord Green, 86 N.J. at 287, 430 A.2d 914. In Henderson, to assist the jury in assessing the reliability of an eyewitness identification, this Court directed the preparation of model jury charges that would help instruct the jury on how a witness' memory works and how that memory can be distorted. 208 N.J. at 283, 298, 27 A.3d 872. In Delgado, Henderson, and Rule 3:11, this Court insisted on the preservation of the identification process. Delgado, 188 N.J. at 63, 902 A.2d 888 ; Henderson, 208 N.J. at 254, 27 A.3d 872 ; R. 3:11. We recognize that a witness' own words and gestures regarding his certainty (or uncertainty) about an identification are critical details in determining the "accuracy and integrity of out-of-court identifications." See Delgado, 188 N.J. at 51, 60, 902 A.2d 888. In October 2012, after the promulgation of Rule 3:11, the New Jersey Attorney General issued a revised model worksheet directing police officers to "document as detailed an account as possible of the exact words/gestures used by the witness" during the photographic identification process. Office of the Attorney General, Photo Array Eyewitness Identification Procedure Worksheet 1-3 (Oct. 1, 2012), https://www.state.nj.us/lps/dcj/agguide/Eye-ID-Photoarray.pdf. Indeed, question seventeen on the worksheet instructs the officer to "document the exact words and gestures used by the witness to describe his/her level of confidence" in making an identification. Id. at 2.
In the case before us, despite having access to recording devices at headquarters, the police did not document the exact words and gestures used by the victim in identifying a photograph of Anthony -- a violation of our case law, our court rule, and the Attorney General's guidelines. The failure to abide by the recordation requirement was tantamount to the failure to preserve evidence.
When a party has a lawful obligation to preserve evidence and fails to do so, a court may charge the jury on its right to draw an adverse inference against that party.
**244 State v. Dabas, 215 N.J. 114, 140, 71 A.3d 814 (2013) ; see also Jerista v. Murray, 185 N.J. 175, 203, 883 A.2d 350 (2005) (concluding that the plaintiffs were entitled to an adverse inference charge if they could show that the defendant's recklessness caused the destruction of relevant evidence). In Dabas, a prosecutor's investigator destroyed notes taken during an interview of the defendant, even though those notes were discoverable pursuant to Rule 3:13-3. 215 N.J. at 118, 71 A.3d 814. We held that "[a]n adverse-inference charge is one permissible remedy for a discovery violation, such as the destruction of interrogation notes that should have been turned over to the defense."
*248 Id. at 140, 71 A.3d 814. We reversed the conviction in Dabas because the court's failure to charge the jury on the permissibility of drawing an adverse inference based on the State's discovery violation was clearly capable of causing an unjust result. Id. at 142, 71 A.3d 814.
In the present case -- a case in which the State's only evidence was the victim's identification -- the jury needed to be instructed on the requirements of Rule 3:11 and be informed that law enforcement failed to abide by that Rule. Without that essential information, the jury could not properly evaluate the reliability of the identification. No case better illustrates the centrality of an appropriate jury charge to a fair trial than State v. Cromedy, 158 N.J. 112, 727 A.2d 457 (1999).
In Cromedy, the defendant was charged with rape and other offenses based on a wholly uncorroborated eyewitness cross-racial identification. Cromedy, 158 N.J. at 115, 117, 132-33, 727 A.2d 457. The trial judge denied Cromedy's request for a cross-racial identification charge and instead gave the model jury charge on identification. Id. at 118, 727 A.2d 457. No model jury charge on cross-racial identification existed at the time. Id. at 129-30, 727 A.2d 457. Cromedy was found guilty. Id. at 118, 727 A.2d 457. Based on the then-prevailing social-science data, this Court found that charging the jury on the potential risks associated with cross-racial identifications was of critical importance because the identification "was not corroborated by any forensic evidence or other eyewitness **245 account." Id. at 131-33, 727 A.2d 457. The Court therefore reversed Cromedy's conviction and granted him a new trial. Id. at 133, 727 A.2d 457. During preparation for the retrial, DNA testing revealed that Cromedy was not the victim's sexual assailant. Ronald Smothers, DNA Tests Free Man After 6 Years; Had Been Convicted In Rape of Student, N.Y. Times, Dec. 15, 1999, at B6. Six years after his wrongful conviction, Cromedy was released from prison, and the charges against him were dismissed. Ibid.
Cromedy is a reminder of the limitations of human memory. An appropriate jury charge on eyewitness identification and thus an informed jury may be the greatest safeguard against a wrongful conviction.
III.
As noted earlier, I join with the Court in the progressive steps it takes today to improve the recording procedures relating to eyewitness identifications. However, the remand to the trial court to investigate evidence of possible suggestiveness in the identification process should be but one avenue of relief. What we do know is that the failure of law enforcement to record the identification process in this case deprived the jury of potentially critical information concerning the reliability of the identification. We also know that law enforcement breached the recordation requirements set forth in our case law and court rule and therefore failed to preserve evidence. In my view, the trial judge committed plain error by not providing the most appropriate remedy under Rule 3:11 -- an adverse-inference charge.
A properly charged jury may have determined that the State fell short of its burden of proving the reliability of the identification. We should not have to wait years to learn whether Anthony is the unfortunate casualty of a misidentification. I do not believe that Anthony received a fair trial, and thus I would reverse his conviction and grant him a new trial.
**246 I therefore respectfully dissent.

Delgado commended the Attorney General's Office for issuing guidelines in 2001 that directed officers to "[r]ecord both identification and nonidentification results in writing, including the witness' own words regarding how sure he or she is." 188 N.J. at 61, 902 A.2d 888 (quoting Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures 1 (Apr. 18, 2001) ).

For example, the parties debate whether and how the Rule prioritizes among different methods of recording. Section (b) says that an officer shall record the identification procedure "in writing, or, if feasible, electronically." R. 3:11(b) (emphasis added). The Rule does not say to record "electronically, if feasible, but if not, then in writing." We agree that the current Rule can benefit from greater clarity.

To help law enforcement officers accurately document the administration of a photo array, the Division of Criminal Justice issued a model worksheet that is designed to comply with Rule 3:11. See Photo Array Worksheet. For example, question 12 of the worksheet asks, "Did you ask the witness whether he/she had previously spoken to anyone (law enforcement or civilian) about the identification?" If so, a detailed summary is to be provided. Question 14 asks, "Did you or anyone else present say or do anything during or after the procedure that would have suggested to the witness that he/she correctly identified the suspect? ... (If yes, detail any actions/gestures/dialogue)." Question 17 asks, "[D]id you ask the witness during the procedure to make a statement concerning his/her level of confidence that the photo he/she selected depicts the perpetrator? ... You must document the exact words and gestures used by the witness to describe his/her level of confidence." And question 18 asks, "Did you repeat back to the witness the language quoted in the answer to # 17 and confirm that is what he/she said about his/her level of confidence?"

By contrast, in State v. Cromedy, 158 N.J. 112, 727 A.2d 457 (1999), a case that turned on cross-racial identification, no model charge on the subject existed in New Jersey at the time of trial, and the jury received no guidance at all on the issue.