**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3909-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

GLENFORD G. FINDLAY,

     Defendant-Appellant.

_____

Submitted November 8, 2021– Decided November 19, 2021

Before Judges Fasciale and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 17-04-0886.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the briefs).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a jury trial, defendant appeals from his convictions for second-degree conspiracy to commit carjacking, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:15-2(a)(2); first-degree carjacking, N.J.S.A. 2C:15-2(a)(2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Defendant argues primarily that the motion judge erred in denying his motion for a Wade[1] hearing and that the trial judge imposed an excessive sentence. We affirm.

Around 3:30 a.m. on August 31, 2016, Tikah Arrington was sitting in her car in front of her apartment building in the parking lot with the windows rolled down. A car with two occupants pulled into the parking lot and parked alongside Arrington's driver's side. The occupant in the front passenger's seat told Arrington to "get out of [her] car." The front passenger then exited the car and attempted to open Arrington's driver's side door. The front passenger opened the driver's side door of Arrington's car and pointed a gun at her stomach. Arrington fled to her apartment building where she observed the gunman's

---

[1] United States v. Wade, 388 U.S. 218 (1967).

A-3909-18

vehicle and her vehicle being driven away. Five minutes after the carjacking, Arrington and her friend called 9-1-1 to report the armed robbery.

Officers Wayne Adams and E.H. Carter, Jr. were the first officers to arrive at the scene and speak with Arrington. Adams testified that Arrington described the armed front passenger as being "between [five foot six inches] and [five foot eight inches], wearing a white t-shirt, blue jeans, short haircut" and having a medium complexion. Arrington described the driver of the car as being in his early twenties and wearing "a white t-shirt with his hair[] [in] dreads, braids, pushed up in like a bun and a bandana around it."

Detective John Bocchino was assigned to investigate the carjacking of Arrington. Later in the morning of the carjacking, Arrington arrived at the East Orange police precinct to view a photo array of over 650 photos. Arrington flagged eight photos from the array, noting that two photos resembled the assailant who exited the vehicle and none of the remaining photos resembled either assailant. When the police showed Arrington updated versions of the two photos that she previously flagged, she stated neither were the assailants.

Bocchino went to the scene of the carjacking and recovered surveillance camera footage from Arrington's apartment building, which he showed to Arrington. The surveillance video showed the assailants arriving next to

3

Arrington's vehicle at 3:11 a.m. and Arrington running away twenty-nine seconds later.

On September 1, 2016, Bocchino created another array with six photographs from the previous array. Detective Sharieff Greenwood conducted the photo array and recorded the procedure. Arrington identified co-defendant Dashawn Ward as the "one who actually took [her] vehicle" at gunpoint, prompting Bocchino to obtain an arrest warrant and arrest defendant.

On September 7, 2016, Bocchino asked Arrington to return to the police station again to view a second six-photo array. Detective Rolando Baugh administered the photo array, which was also video recorded. Arrington identified defendant as the driver of the vehicle. After Arrington's identification, Bocchino asked Baugh to complete pretrial identification documentation, including a Photo Array Eyewitness Identification Procedure Worksheet (the worksheet), which Baugh only partially completed. Bocchino later arrested defendant outside of his apartment building.

On February 5, 2018, the motion judge denied defendant's motion to dismiss the indictment but granted defendant's motion for a testimonial Wade hearing for later that month regarding Arrington's pretrial identifications. The judge explained that he granted the motion for a hearing "not . . . because there

was suggestiveness," but "because there's not enough information to determine the system variables." The motion judge heard testimony from Bocchino and Baugh and reviewed the pretrial identification procedure recordings before denying defendant's motion.

On appeal, defendant raises the following arguments for this court's consideration:

> POINT I
>
> A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION EXISTS WHERE THE STATE DID NOT OFFER A REASONABLE EXPLANATION FOR OMITTING ANSWERS TO MATERIAL QUESTIONS ON THE EYEWITNESS IDENTIFICATION PROCEDURE WORKSHEET AS REQUIRED, ONE OF WHICH RELATED TO ITS STAR WITNESS'S LEVEL OF CERTAINTY.
>
> POINT II
>
> THE TRIAL JUDGE ABUSED HER DISCRETION WHERE SHE FOUND AGGRAVATING FACTOR SIX APPLIED BASED SOLELY ON THE ELEMENTS OF THE CRIME.

I.

We begin by addressing defendant's argument that the motion judge's conclusion the record does not demonstrate suggestiveness contradicts his

5

findings and that he improperly concluded the Wade hearing before defendant was able to examine estimator variables.

To obtain a Wade hearing, a defendant must "present some evidence of suggestiveness tied to a system variable which could lead to a mistaken identification." State v. Anthony, 237 N.J. 213, 233 (2019) (citing State v. Henderson, 208 N.J. 208, 288-89 (2011)). "System variables" include blind identification, pre-identification instructions, lineup construction, feedback, recording confidence, multiple viewings, showups, private actors, and other identifications made. Henderson, 208 N.J. at 288-90. If a defendant proffers such evidence, the State "must then offer proof to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables." Id. at 289.

The defendant may cross-examine the State's witnesses as well as present their own witnesses and evidence relating to system and estimator variables. Ibid. At any point during the hearing, if the judge finds that based on the testimony, defendant's threshold allegation of suggestiveness is baseless, he or she may end the hearing. Id. at 290-91. "Under those circumstances, the [judge] need not permit the defendant or require the State to elicit more evidence about estimator variables; that evidence would be reserved for the jury." Id. at 291.

A-3909-18

At all times, the burden of proof remains with the defendant to "prove a very substantial likelihood of irreparable misidentification." Id. at 289. If the judge determines that based on the totality of the circumstances the defendant has "demonstrated a very substantial likelihood of irreparable misidentification, the [judge] should suppress the identification evidence." Ibid. Our Court has not "created bright-line rules that call for the 'suppression of reliable evidence any time a law enforcement officer makes a mistake.'" Anthony, 237 N.J. at 239 (quoting Henderson, 208 N.J. at 303); see State v. Green, 239 N.J. 88, 109 (2019) (noting that the Court has not "suggest[ed] that any time a full record of an identification is not preserved, the evidence must be excluded").

Bocchino testified that he called Arrington on September 6, 2016, spoke to her briefly and asked her to return to police headquarters to view the second photo array the next day. He spoke to Arrington for thirty seconds and explained to her that Baugh would administer the photo array. Bocchino testified that it was his normal practice to ask the witness prior to administering the photo array whether anyone had spoken to them before administering the array, but he did not ask Arrington this question, and Arrington did not voluntarily inform him that she had heard from or communicated with anyone prior to the arrays. He did not tell Arrington that he had developed a suspect and did not direct her to

flag any one photo from the array. At the conclusion of the photo array, Bocchino took a recorded statement from Arrington.

Baugh testified that he had no prior knowledge of the case, was not involved in the investigation, and did not select the photos used in the array. He filled out the photo display instruction form, photo display report form, and photographic identification form during the recording. Baugh obtained the worksheet to fill out after the photo array concluded, but he failed to record responses for each question. He testified that he did not record a response for question fourteen[2] because he was "[p]robably too busy doing things in between and missed it" and that Arrington did not ask him questions about the procedures. He also testified that he did not fill out question sixteen[3] because he "forgot" because he was "working and handling so many other tasks" at the time.

Baugh further testified that he could not recall whether he asked Arrington to describe her level of confidence when completing Questions twenty-one and

---

[2] Question fourteen reads: "Did the witness ask any questions about the procedure?"

[3] Question sixteen reads: "Did you ask the witness whether he/she had previously spoken to anyone (law enforcement or civilian) about the identification?"

twenty-two.[4] He testified that he wrote that Arrington "states she is positive" because his "perceived notion [was] that she was positive" and because she "seemed very sure." However, Baugh testified that he did not believe Arrington affirmatively stated that she was positive. And although Baugh answered "yes" to question twenty-two, he did read the answer to question twenty-one to Arrington before doing so.

The motion judge described Baugh's failure to properly record responses on the worksheet as "sloppy," and even if Baugh was busy or interrupted, that did not "justify [his] sloppiness." The motion judge determined that despite the failure to properly complete the worksheet, there was "nothing to demonstrate even by a preponderance of the evidence that there was any suggestiveness" and "absolutely nothing to indicate that anything was suggest[ed] to the witness."

After hearing testimony from Bocchino and Baugh and reviewing the identification procedure video, the motion judge agreed that the detectives were "sloppy when completing the report" and they "did not follow the worksheet

---

[4] Question twenty-one reads: "If yes to [number twenty], did you ask the witness during the procedure to make a statement concerning his/her level of confidence that the photo he/she selected depicts the perpetrator?" Question twenty-two reads: "Did you repeat back to the witness the language quoted in the answer to [number twenty-one] and confirm that is what he/she said about his/her level of confidence?"

instructions to a tee," but that even "conced[ing] that this was not done as well as it should have been done, there's . . . nothing to demonstrate even by a preponderance of the evidence that there was any suggestiveness." As to defendant's contention that the detectives had unrecorded conversations with Arrington prior to the pretrial identification, which establishes suggestiveness, the motion judge explained that it was unsurprising that the short conversations that Bocchino had before the photo arrays were not recorded as they involved Bocchino asking Arrington to come to view the photo array and informing her that Baugh would be administering the double-blind procedure. The motion judge properly determined that there was "absolutely nothing to indicate that anything was suggestive to the witness based on the totality of the circumstances."

The motion judge concluded the <u>Wade</u> hearing without exploring estimator variables. The motion judge noted that defendant would "be able to cross-examine . . . Arrington at length about" the identification procedure and could put forth arguments calling into question the reliability of her identification. <u>See</u> <u>Henderson</u>, 208 N.J. at 290-91 (noting that when a trial judge concludes that a defendant's "initial claim of suggestiveness is baseless, and if no other evidence of suggestiveness has been demonstrated by the evidence, the

[judge] may exercise [his or her] discretion to end the hearing" and leave evidence of estimator variables to the jury). Here, the judge properly ended the hearing and left the exploration of estimator variables for the jury to determine.

## II.

Next, defendant argues that the trial judge imposed a manifestly excessive sentence. Defendant asserts that the trial judge improperly found aggravating factor six by considering the elements of the crime in her analysis and, therefore, improperly double counted his criminal history.

We review a trial judge's sentencing decision for an abuse of discretion. State v. Jones, 232 N.J. 308, 318 (2018). This deferential standard applies only when "the trial judge follows the Code and the basic precepts that channel sentencing discretion." State v. Trinidad, 241 N.J. 425, 453 (2020) (quoting State v. Case, 220 N.J. 49, 65 (2014)). We will "affirm the sentence of a trial [judge] unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

11

A trial judge "must identify any relevant aggravating and mitigating factors set forth in N.J.S.A. 2C:44-1(a) and (b) that apply to the case." Case, 220 N.J. at 64 (citing State v. Fuentes, 217 N.J. 57, 72 (2014)). The judge must then "determine which factors are supported by a preponderance of [the] evidence, balance the relevant factors, and explain how it arrives at the appropriate sentence." State v. O'Donnell, 117 N.J. 210, 215 (1989). The judge's application of these factors "must be supported by competent, credible evidence in the record." Case, 220 N.J. at 64.

Judges may consider a defendant's "uninterrupted history of criminality" in their determination of whether aggravating factor six is applicable. See State v. Dalziel, 182 N.J. 494, 502 (2005). Judges may also consider a defendant's juvenile and municipal records, State v. Taylor, 226 N.J. Super. 441, 453-54 (App. Div. 1988), as well as a defendant's adult arrests which do not result in convictions, State v. Rice, 425 N.J. Super. 375, 382 (App. Div. 2012) (noting that adult arrests that do not result in convictions may be relevant to the sentence imposed).

Judges must "avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense," such as "[e]lements of a crime, including those that establish its grade." State v. Lawless, 214 N.J. 594,

12

608 (2013). However, a judge does not impermissibly double count when they consider a defendant's prior criminal history for multiple aggravating and mitigating factors. State v. Tillery, 238 N.J. 293, 328 (2019); see State v. McDuffie, 450 N.J. Super. 554, 576-77 (App. Div. 2017). A defendant's criminal record is not included in the "[f]acts that establish[] elements of a crime for which a defendant is being sentenced" and "should not be considered as aggravating circumstances in determining that sentence." McDuffie, 450 N.J. Super. at 576 (second alteration in original) (quoting State v. Kromphold, 162 N.J. 345, 353 (2000)). Nor is a judge "required to ignore the extent of [a defendant's] criminal history when considering applicable aggravating factors." Id. at 577.

In finding aggravating factor three applicable, the trial judge considered defendant's criminal and juvenile record, which she determined demonstrated a "reckless disregard for the law." Four juvenile complaints have been filed against defendant, three of which were dismissed and one of which resulted in a probationary term. Defendant has two adult arrests, one of which was downgraded to a disorderly persons conviction resulting in probation, which he later violated. Defendant also had an outstanding bench warrant for failing to appear. In finding aggravating factor six applicable, the judge not only noted

13

that defendant's charges "are very, very serious" "first[-]degree" charges, which are "the most serious in the State of New Jersey" and carry a sentencing range of "[ten] to [thirty] years," but appropriately incorporated her prior consideration of defendant's criminal and juvenile history in finding factor six applicable.

The trial judge considered these facts, determined that aggravating factor six is applicable, and imposed a proper sentence. The trial judge did not rely solely on the fact that defendant's convictions were for "very serious" first-degree charges, see State v. Carey, 168 N.J. 413, 428 (2001), nor did she double count.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3909-18