# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4276-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

HAKEEM O. WILLIAMS, a/k/a
HAKEEM BRIAN WILLIAMS,
HAKEEM O. BRIAN WILLIAMS,
HAKEEM GOLDSMITH, and
HAKEEN WILLIAMS,

     Defendant-Appellant.

_____

Submitted February 25, 2020 – Decided May 5, 2020

Before Judges Fisher and Gilson.

On appeal from the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 17-01-0029.

Joseph E. Krakora, Public Defender, attorney for appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the briefs).

John T. Lenahan, Salem County Prosecutor, attorney for respondent (David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A man, his girlfriend, and their one-year old son were driving together in a car, when the man, who was driving, stopped the car to speak with another man walking on the street. The pedestrian pulled out a gun, shot the driver four times, and took the car with the infant still in the backseat.

A jury convicted defendant Hakeem Williams of first-degree murder of the driver, N.J.S.A. 2C:11-3(a)(1); first-degree kidnapping of the son, N.J.S.A. 2C:13-1(b)(1); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); third-degree theft of a motor vehicle, N.J.S.A. 2C:20-10(c); and fourth-degree reckless endangering another, N.J.S.A. 2C:24-7.1(a)(2). Defendant was sentenced to an aggregate prison term of fifty years, with periods of parole ineligibility.

Defendant appeals his convictions and sentence, arguing that there were evidentiary errors at his trial and the sentence was excessive because three of the prison terms were run consecutively. Discerning no reversible error, we affirm the convictions and sentence.

## I.

We take the facts from the evidence at trial. On the afternoon of July 9, 2016, J.I., his girlfriend, Y.T., and their one-year-old son were driving together in a Jetta Volkswagen.[1] J.I. was driving and the couple was looking at neighborhoods in Penns Grove where they were considering buying a home. As they drove down a street, they saw a man walking in the opposite direction and J.I. turned the car around to speak with the man. At trial, the girlfriend explained that J.I. thought the man had given him a strange look. As the men were speaking, the girlfriend told J.I. she thought the man had a gun. The man then pulled out a gun and started shooting at J.I.

The girlfriend got out of the car and J.I. followed her through the front passenger seat door. J.I. then collapsed on the sidewalk. As the girlfriend was attending to J.I., she saw the man get into their car and drive away with their son still in the backseat.

Shortly after the shooting, police officers responded to the scene. The girlfriend explained what happened and that she did not know the shooter. She then described the shooter as a heavy-set black man with big eyes, who was

---

[1] We use initials or descriptions for the victim and witnesses to protect their privacy interests.

approximately five feet six inches to five feet seven inches tall. Some of the events at the scene were recorded on a motor vehicle recording (MVR) system on one of the police vehicles.

J.I. was taken to a hospital where he was pronounced dead. An autopsy revealed that he had been shot four times, and a medical examiner testified J.I. died as a result of his gunshot wounds. Police recovered three bullet casings at the scene.

The Jetta was found later that same evening. A woman saw the car parked on a street in Philadelphia with its engine running. She noticed a child asleep in the backseat, after observing the car for several minutes, she called the police. When the police responded they found that the child was unharmed and he was returned to the girlfriend, his mother.

That same night the girlfriend was shown a photo array containing six photographs. The photo array was administered by a detective who was not involved in the investigation and the procedure was video recorded and played for the jury at trial. The girlfriend identified a photograph of defendant as the man who had shot her boyfriend and taken her car and child.

At trial the girlfriend also identified defendant as the shooter and the man who had taken her car and child. On cross-examination the girlfriend revealed,

apparently for the first time, that when she first came into the office at the police station where the array was conducted, she saw a picture that looked like defendant sitting on the side on a table. The girlfriend went on to testify that she told a police officer that the photograph looked like the "guy."

Defense counsel contended that the identification should be excluded; accordingly, the trial court conducted an evidentiary hearing outside the presence of the jury. At that hearing, the girlfriend was shown a portion of the video of her photo identification and she testified that she was unsure where exactly she saw the "side" photo.

The detective who conducted the photo array also testified during the evidentiary hearing. He explained that there were no other photographs on his desk when the girlfriend entered the office and he was unaware of any other photographs of defendant being in the room at the time that the photo array was conducted. He also testified that the girlfriend never mentioned seeing defendant depicted in a photograph other than the photograph presented in the array.

The sergeant who prepared the photo array also testified at the evidentiary hearing. He explained that he placed the photographs in a folder and handed it

5

to the detective who conducted the array and that the girlfriend never mentioned seeing another photograph depicting defendant.

After hearing that testimony, the trial court found that there was no evidence that any law enforcement officer showed the girlfriend a photograph prior to the photo array. In that regard, the trial court found that the evidence did not establish that the girlfriend saw a photograph of defendant before being presented with the photographs in the photo array. Accordingly, the trial court allowed the testimony concerning the girlfriend's out-of-court and in-court identification of defendant to stay in evidence.

At trial the State also called another witness, A.G., to support the identification of defendant as the shooter. A.G. testified that on the day of the shooting she was visiting a friend's house near where the shooting took place. She explained that she was introduced to a heavy-set black man who she identified as defendant at trial. A.G. went on to testify that approximately fifteen minutes after defendant left the house she was visiting, she heard gunshots.

As part of its case, the State also played the MVR video of the scene following the shooting. The MVR video was admitted into evidence after an officer testified that it accurately reflected what he observed at the scene.

A-4276-17T2

The video was played for over an hour in two segments. The first segment lasted approximately thirty-seven minutes. The video depicted the visibly distressed girlfriend stating that the assailant had taken her "baby" and imploring the police officer to pray for her son.

After the first portion of the video was paused, defense counsel requested a side bar. Counsel then, for the first time, contended that the remainder of the video should be excluded from evidence as prejudicial. The State countered that the jury should be allowed to see the entire video because a storm prevented law enforcement from taking pictures of the crime scene. The court denied defendant's application and ruled that the jury would be allowed to see the entire MVR video.

In the second portion of the video the girlfriend was again depicted and heard to repeatedly ask for her son to be brought back. Also, an unidentified speaker can be heard saying a prayer for the girlfriend and her son.

After seeing the entire MVR video, the trial court informed counsel that it would give the jury a limiting instruction concerning the video. The court then instructed the jury to disregard statements or comments made by people who had not yet testified in court. The court also instructed the jury to disregard any expressions of sympathy for the girlfriend and the child and that their

decision was to be based only on the evidence presented in the court room and not on sympathy.

After hearing the evidence at trial, the jury found defendant guilty of first-degree murder, first-degree kidnaping, third-degree endangering the welfare of a child, second-degree unlawful possession of a weapon, second-degree possession of a weapon for an unlawful purpose, third-degree theft of a motor vehicle, and fourth-degree endangering another person.

Thereafter, the court sentenced defendant. The conviction for possession of a weapon for an unlawful purpose was merged with the murder conviction and the convictions for endangering the welfare of a child and reckless endangerment were merged with the kidnaping conviction. On the murder conviction, defendant was sentenced to thirty years in prison with thirty years of parole ineligibility. On the kidnapping conviction, he was sentenced to fifteen years in prison subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. On the conviction for unlawful possession of a weapon, defendant was sentenced to five years in prison with forty-two months of parole ineligibility. Finally, on the conviction for theft of a motor vehicle, defendant was sentenced to three years in prison. The prison terms for the convictions of murder, kidnaping, and unlawful possession of a weapon were run consecutively and the prison term for

the conviction for theft of a motor vehicle was run concurrently to the other prison terms. Consequently, the aggregate sentence was for fifty years in prison with over forty-five years of parole ineligibility.

Defendant filed this appeal. Shortly thereafter, the trial court filed a written memorandum amplifying its sentencing decision. See R. 2:5-1(b).

## II.

On appeal, defendant presents five arguments for our consideration:

POINT I - DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE JUDGE'S DECISION TO PERMIT THE PROSECUTOR TO PLAY FOR THE JURY THE ENTIRE HOUR-PLUS MV RECORDING OF THE CRIME'S AFTERMATH AT THE SCENE.

POINT II - THE PROSECUTOR'S ACTS OF PROFESSIONAL MISCONDUCT DURING HIS OPENING AND SUMMATION DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

POINT III - THE KIDNAPPING CONVICTION MUST BE VACATED BECAUSE THE STATE FAILED TO ESTABLISH AN ESSENTIAL ELEMENT OF THE OFFENSE.

POINT IV - THE FAIRNESS OF THE TRIAL WAS IRREPARABLY DAMAGED BY THE COURT'S REFUSAL TO EXCLUDE [THE GIRLFRIEND'S] IN-COURT AND OUT-OF-COURT IDENTIFICATIONS OF DEFENDANT.

We are not persuaded by any of these arguments and we will address them in turn.

 1. The MVR Video

Defendant argues that it was prejudicial error to allow the MVR video to be played for the jury. In particular, he challenges the playing of the second portion of the video after defense counsel raised an objection.

We review rulings on the admissibility of evidence for abuse of discretion. State v. Rose, 206 N.J. 141, 157 (2011) (citing Brenman v. Demello, 191 N.J. 18, 31 (2007)). Only those evidentiary rulings that are "so wide [of] the mark that a manifest denial of justice resulted" should be reversed. Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)). When no objection is made, we review for plain error and reverse only if the error is "clearly capable of producing an unjust result." Rose, 206 N.J. at 157 (quoting R. 2:10-2).

Neither the State nor defense counsel made a pre-trial motion concerning the admissibility of the MVR video. Instead, the State introduced the MVR video during the testimony of a police officer who responded to the shooting

10

scene.  The State contended that the video recording was relevant to show the crime scene and to hear the girlfriend's description of the shooter. Defense counsel made an authenticity objection, which was overruled, and the MVR video was introduced into evidence.

The video was then played for the jury in two segments.  The first segment ran for approximately thirty-seven minutes.  During that segment the video showed, among other things, (1) the officer's arrival; (2) the girlfriend explaining what happened and describing the shooter; (3) the girlfriend recognizing that her boyfriend had no pulse and had died; and (4) the girlfriend repeatedly asking the police to find her baby and to pray for the safety of the child.

The video was then paused, and the trial judge asked the jury if they wanted to take a break, which they declined.  Defense counsel then requested a side bar and there argued that no more of the video should be shown because it would be prejudicial and cumulative.  In response, the State contended that the video was already in evidence and the jury should be allowed to see the entire video because it depicted the crime scene.  In that regard, the State argued that the scene had not been extensively photographed because a storm arrived and therefore the video was probative evidence.

11

The trial judge noted that no pre-trial motion concerning the video had been made and she had not reviewed the rest of the video. The judge then ruled that because the video was already in evidence, the remainder of the video could be played for the jury.

Accordingly, the second segment of the video, which was approximately fifty minutes long, was played. That portion of the video showed or recorded (1) police and the girlfriend discussing the search for the child; (2) concern for the safety of the child; and (3) an unidentified speaker saying a prayer for the girlfriend and the child.

After the entire video had been played, the trial judge, outside the presence of the jury, informed counsel that she would give a limiting instruction concerning the MVR video. The judge and counsel then agreed upon an instruction and the judge read that instruction to the jury. The judge directed the jury to disregard any comments by unidentified individuals or police officers who had not testified in court. The judge also instructed the jury to disregard any comments based on sympathy and to decide the case based only on the facts as they found them from the evidence and testimony presented at trial. Specifically, the jury was instructed as follows:

This morning, you viewed a DVD recording of images from the MVR, or motor vehicle recorder, of Patrolman Hemple's vehicle.

This recording, which occurred at the scene of the crime, included comments by not only Patrolman Hemple and . . . the girlfriend of the victim.

But also by other officers, both identified and unidentified, about the crime scene or the ongoing investigation. There were comments made by unidentified individuals, who were not officers.

You are the judges of the facts. One of the things you will consider in deciding the facts is the credibility of the witnesses who appear before you.

At this point in the trial, you have heard the testimony of just two witnesses; Patrolman Hemple and Patrolman Spinelli.

To the extent that you heard other officers or individuals speak on the recording, you should disregard statements or comments made by them until such time as you have had an opportunity to hear them testify in this courtroom. Only then can you fully consider their statements and their credibility.

Second; the recording also included comments by officers and other individuals, expressing sympathy for [the girlfriend] and concern for her child.

While those events are part of the DVD that is in evidence, you are instructed that your ultimate decision in this case must be based upon the facts that you find from the testimony and evidence presented in this courtroom. Your decision may not be based upon sympathy.

A-4276-17T2

You are instructed to disregard any comments or statements contained in the DVD, which were not factual in nature but were instead expressions of sympathy or concern.

As already noted, there was no objection to playing the first portion of the video. We discern no plain error in the playing of the first portion of the video, particularly considering the judge's limiting instruction. The video had some probative value in depicting the crime scene. It also had the potential to appeal to the jury's sympathies. The limiting instruction, however, addressed that potential prejudice. Accordingly, the record does not reflect that the video was unduly prejudicial. Moreover, the record does not reflect that the playing of the first portion of the video was capable of producing an unjust result. See R. 2:10-2.

We also discern no abuse of discretion in the playing of the second portion of the MVR video. The better practice may have been for the trial judge to have taken a recess and reviewed the remaining portion of the video before it was played for the jury. Nevertheless, the record does not demonstrate that the second portion of the video was unduly prejudicial. "Evidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation'

14

of the issues in the case." Griffin, 225 N.J. at 421 (alteration in original) (citations omitted). Again, the trial judge's instruction to the jury limited the prejudicial impact of the full MVR video. The jurors were instructed to disregard statements or depictions that played on their sympathy and they were expressly instructed to base their determinations on the evidence at trial.

As part of the challenge to the playing of the MVR video, defendant argues that the video functioned as a preemptive attempt to bolster the credibility of the girlfriend in violation of Rule 607. Rule 607 states that a "prior consistent statement shall not be admitted to support the credibility of a witness, except to rebut an express or implied charge against the witness of recent fabrication or of improper influence or motive and except as otherwise provided by the law of evidence." Defense counsel did not make this argument at trial and again, we review it for plain error. See State v. Nunez, 436 N.J. Super. 70, 76 (App. Div. 2014). Having reviewed the MVR video and the testimony of the girlfriend, we discern no plain error.

Finally, defendant argues that his trial counsel was ineffective in failing to file a pre-trial motion to exclude the MVR video and that we should remand for a new trial. We decline to consider this argument as part of this direct appeal.

We generally do not hear ineffective assistance claims on direct appeal because the claim ordinarily "involve[s] allegations and evidence that lie outside the trial record." State v. Hooper, 459 N.J. Super. 157, 175 (App. Div. 2019) (quoting State v. Castagna, 187 N.J. 293, 313 (2006)). Such ineffective assistance claims are "particularly suited for post-conviction review because they often cannot reasonably be raised in a prior proceeding." Id. at 174-75 (quoting State v. Preciose, 129 N.J. 451, 460 (1992)).

2. The Alleged Misconduct by the Prosecutor

Defendant contends that the assistant prosecutor engaged in misconduct that deprived him of a fair trial. He points to three types of statements and arguments made by the prosecutor during his opening and closing statements. First, defendant argues that the prosecutor misrepresented the roles of counsel by glorifying the prosecutor's role and diminishing the role of defense counsel. Second, he asserts that the prosecutor improperly flattered the jurors to win them over as allies. Finally, he contends that the prosecutor invited the jury to identify with the girlfriend and to sympathize with the trauma she experienced.

Prosecutors are afforded reasonable latitude during openings and closings. State v. R.B., 183 N.J. 308, 330 (2005) (citation omitted); State v. Williams, 113 N.J. 393, 447 (1988) (citations omitted). Nevertheless, prosecutors must

16                                                          A-4276-17T2

"confine their comments to evidence revealed during the trial and reasonable inferences to be drawn from that evidence." State v. Smith, 167 N.J. 158, 178 (2001). When considering claims of prosecutorial misconduct, we first determine whether misconduct occurred, and if so, whether it deprived the defendant of a fair trial. State v. Wakefield, 190 N.J. 397, 446 (2007) (quoting Smith, 167 N.J. at 181). Accordingly, even when a prosecutor's comments constitute misconduct, reversal of a defendant's conviction is not justified unless the comments were "so egregious . . . [they] deprived [the] defendant of a fair trial." State v. McGuire, 419 N.J. Super. 88, 139 (App. Div. 2011) (quoting State v. Ramseur, 106 N.J. 123, 322 (1987)).

We also consider whether defense counsel made a timely objection. Smith, 167 N.J. at 181-82 (citations omitted). If no objection was made, usually the remarks will not be deemed prejudicial. State v. Frost, 158 N.J. 76, 83 (1999) (citing Ramseur, 106 N.J. at 323). In such circumstances, we look for plain error and will only reverse if there is a "reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached." State v. Feal, 194 N.J. 293, 312 (2008) (quoting State v. Daniels, 182 N.J. 80, 102 (2004)).

Defendant first complains about the prosecutor's misstatements concerning the roles of counsel. In his opening statement the prosecutor told the jury:

> Now, the purpose of my opening statement is to give you a brief outline of what you can expect to hear the next few days and also give you a general description of what the different roles of the people in this courtroom are.
>
> Now, there's you, the jury . . . [defense counsel] and myself. We are the . . . main parties in this game or in this trial.
>
> Now, [defense counsel] is a well-respected attorney. He's experienced and someone that I hold in high regard. His job simply is to advocate passionately and strenuously for his client.
>
> His job is to serve as the mouthpiece for his client, to give you arguments as to why he believes his client is [innocent].
>
> Another person in the courtroom is myself, the Assistant Prosecutor. Now, a lot of people think my job is difficult but to be quite frank with you, my job is not. It's pretty simple.
>
> My job is simply to present the evidence to you and present the witnesses to you, that led to these charges. My job is not to punish Hakeem Williams. My job is not to convict Hakeem Williams.
>
> My job is simple. I just present the evidence, I present the witnesses and it's for you to consider.

A-4276-17T2

We agree with defendant that these descriptions were not appropriate or accurate. Defendant did not object to them at the time, however, and we discern no plain error. Fortunately, the trial court had defined the roles of the various parties in the preliminary instructions to the jury. In the closing instructions, the court also explained that statements by counsel were not evidence and that the court would explain the law to the jury. Accordingly, any potential prejudice from the prosecutor's misstatements did not have the potential to mislead the jury.

Next, defendant argues that the prosecutor tried to win the jury over with flattery. In that regard, he points to the prosecutor's opening and closing statements. In his opening statement, the prosecutor told the jury:

> Now, we just went through several days of a jury selection process. I think it was like two or three days. We even had to take a week break for you guys to come back in.
>
> You answered five to six pages of questions. You guys gave us biographical information about yourselves. I hope you realized and I hope you noticed that when you guys were answering these questions, I was paying attention very closely and very carefully.
>
> I want to make sure that whatever members of the jury [are] in this box, that they are able to keep an open mind. I want to be able to make sure that they're able to pay attention, stay focused and listen to what the people say.

19

> And most importantly, I wanted to make sure that every member of this jury box is someone who is free of any potential bias. I can confidently say that every person in this jury box is someone that I feel has all of those qualities.

We agree that these comments were not appropriate. Here again, however, defense counsel made no timely objection. Indeed, defense counsel engaged in similar flattery to the jury in his opening remarks.

When viewed side-by-side both counsel attempted to win over the jury with flattery. Thus, to the extent that these arguments were made, the jury heard them from both sides. More importantly, the trial judge properly instructed the jury that the attorneys' opening and closing remarks were not evidence. Thus, we trust that the jury followed the court's instructions. See State v. Smith, 212 N.J. 365, 409 (2012) (citing State v. Loftin, 146 N.J. 295, 390 (1996)). Consequently, we find no plain error concerning these remarks.

Finally, defendant takes issue with the prosecutor's description of what the girlfriend would testify to during the prosecutor's opening statement. In that regard, the prosecutor made the following remarks to the jury:

> And, ladies and gentlemen, the most important witness you're going to hear from is the witness who's life was impacted the most by this incident.
>
> You're going to hear from a woman who saw her boyfriend shot while he sat in the driver's seat and she

20

sat in the passenger seat, in the middle of the day on July 9, 2016.

You're going to hear from the woman who ran out of the car in panic, in terror, and as you watched her boyfriend get out of the vehicle and collapse on the side of the -- sidewalk.

You're going to hear from the woman who held her boyfriend in her arms; [J.I.], as he lay dying. You're going to hear from the woman who saw her car pull away at a high rate of speed, with her one year old child inside.

You're going to hear about that woman's terror and concern and desperation as the child goes missing and she doesn't know where she -- where he is. Ladies and gentlemen, the last person you're probably going to hear from is [the girlfriend].

Defendant argues that these remarks invited the jury to identify with the girlfriend and the panic and terror that she faced. We disagree. The remarks concerning the girlfriend fell within the bounds of what a prosecutor may permissibly discuss in an opening statement. In that regard, prosecutors are permitted to discuss how he or she generally anticipates a witness will testify. See State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004). We do not discern any blatant and improper appeal to apply the golden rule.

3.    The Kidnapping Conviction

At the close of the State's case, defendant moved to dismiss the kidnapping charge arguing that the State failed to submit evidence that he knew the child was in the car when he stole the car. The trial judge rejected that argument reasoning that the jury could infer that defendant knew or discovered that the child was in the backseat while he had possession of the car.

We review a trial court's decision to deny a motion for acquittal de novo. State v. Williams, 218 N.J. 576, 593-94 (2014) (citing State v. Bunch, 180 N.J. 534, 548-49 (2004)). Accordingly, we "determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Id. at 594 (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)).

A person is guilty of kidnapping "if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period . . . [t]o facilitate commission of any crime or flight thereafter . . . ." N.J.S.A. 2C:13-1(b)(1). The statute does not specify the culpability requirement. Nevertheless, defendant must have acted knowingly in removing the child. See

22

N.J.S.A. 2C:2-2(c)(3) (explaining that unless strict liability is clearly intended, a statute setting forth a crime without specifying the mens rea requirement should be construed as requiring a knowing state of mind); see also State v. Eldakroury, 439 N.J. Super. 304, 310 (App. Div. 2015) (holding that when a criminal statute does not specify the requisite mens rea, the "rule of lenity" requires application of "the knowingly standard").

N.J.S.A. 2C:2-2(b)(2) defines the knowledge requirement and explains:

> A person acts knowingly with respect to the nature of his conduct or the attendant circumstances if he is aware that his conduct is of that nature, or that such circumstances exist, or he is aware of a high probability of their existence. A person acts knowingly with respect to a result of his conduct if he is aware that it is practically certain that his conduct will cause such a result. "Knowing," "with knowledge" or equivalent terms have the same meaning.

A jury "may draw logical inferences from the evidence presented to them," including direct and circumstantial evidence. State v. Cango, 211 N.J. 488, 512 (2012). Our Supreme Court has explained that different inferences can be drawn provided they are based on direct or circumstantial evidence and they support a finding of guilt beyond a reasonable doubt. State v. Samuels, 189 N.J. 236, 246 (2007) (citations omitted). In that regard, the Court has stated:

> [T]here are no legal rules as to what inferences may be drawn. The question is one of logic and common sense.

> When each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole, judgment of acquittal is not warranted.
>
> [Ibid. (alterations in original) (citations omitted).]

At trial the State presented sufficient evidence to support a jury determination that defendant knew the child was in the car when he stole it. The girlfriend testified that defendant was standing right next to the window of the car when he began shooting at the victim. Defendant thereafter drove off with the car and the car was not recovered for several hours. The jury could also reasonably infer that at some point during the flight defendant came to know the child was in the backseat. According the State all reasonable inferences, the trial court did not err in its determination that the jury could conclude beyond a reasonable doubt that defendant knew or came to know that the child was in the backseat of the car while he was fleeing from the shooting.

4.    The Identification of Defendant

Next, defendant argues that this matter should be remanded for a new trial because the trial court erred when it denied his request to exclude the girlfriend's out-of-court identification of him. Specifically, defendant argues that the out-of-court identification was impermissibly suggestive because the girlfriend saw a picture of defendant before the photo array was conducted. Defendant argues

24

that viewing was an impermissible multiple viewing. Defendant also argues that the suggestive out-of-court identification compromised the girlfriend's in-court identification and that identification should have been excluded as well. We disagree.

Our review of a motion to exclude an out-of-court identification is deferential. State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016). We will affirm such rulings if there is sufficient credible evidence to support the findings made by the trial court. Ibid. (quoting State v. Johnson, 42 N.J. 146, 162 (1964)). Recognizing that we are not in as good a position to judge credibility as a trial judge, we give deference to the trial judge's credibility determinations. State v. Dispoto, 383 N.J. Super. 205, 217 (App. Div. 2006) (citations omitted).

Identification of a defendant is often critical evidence. See State v. Anthony, 237 N.J. 213, 241-43 (2019). Accordingly, pre-trial identification procedures must comply with due process. If the process is overly suggestive, the identification should be excluded to protect the defendant's constitutional rights. Foster v. California, 394 U.S. 440, 443 (1969); State v. Henderson, 208 N.J. 208, 285-90 (2011) (citations omitted). In Henderson, our Supreme Court identified factors to be considered in assessing the reliability of eyewitness

25

identifications.  208 N.J. at 247-72.  Those factors are grouped into two categories: system and estimator variables.  System variables are factors that are within the control of the criminal justice system, while estimator variables are factors over which the legal system has no control.  Id. at 247.

When a defendant seeks to exclude an out-of-court identification, he must show "some evidence of suggestiveness tied to a system variable which could have led to a mistaken identification."  Anthony, 237 N.J. at 233 (citing Henderson, 208 N.J. at 288-93).  One of the system variables is whether there were "multiple viewings."  Henderson, 208 N.J. at 255-56, 290.

If a defendant presents evidence of suggestiveness, the burden shifts to the State to "offer proof to show that the proffered eyewitness identification is reliable."  Id. at 289.  The "ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification."  Ibid. (citations omitted).  In that regard, the "threshold for suppression" is high and in most cases the issue of identification should be "presented to the jury."  Id. at 303.

Here, defendant did not file a pre-trial motion to exclude the girlfriend's out-of-court identification of him.  Instead, the issue arose at trial when, on cross-examination, the girlfriend testified that before she was shown the photo array, she saw a picture of defendant on the side on a table.  Following that

testimony, the court conducted an evidentiary hearing outside the presence of the jury. The court then heard testimony from the girlfriend, the detective who administered the photo array, and the sergeant who prepared the photo array. Thereafter, the court denied defendant's request to suppress the out-of-court identification finding that the evidence did not support suppression. In that regard, the court found no credible evidence that the girlfriend had been shown or even seen a side photograph. Moreover, the trial court noted that the jury heard the testimony concerning the side photograph and it was in their province to weigh that evidence in determining the identification issue.

We discern no error in the trial court's ruling. The court's factual findings, including the credibility assessment of the girlfriend's testimony, are supported by credible evidence in the record. While the girlfriend testified on cross-examination that she had seen a side photograph, at the hearing she could not recall if the side photograph was the same photograph presented during the photo array. More importantly, the trial court determined that there was sufficient reliability in the girlfriend's out-of-court identification of defendant. In that regard, the girlfriend was consistent and confident in her identification of defendant as the shooter and the person who stole her vehicle.

A-4276-17T2

As part of his case, defendant presented testimony that a detective had printed Facebook photographs of defendant in connection with the investigation. That evidence, however, does not prove that the girlfriend saw a "side" photograph of defendant.

Moreover, the trial court provided the jury with a comprehensive instruction regarding the girlfriend's identification of defendant. In that instruction, the court explained the issue of multiple viewings. Accordingly, we discern no reversible error in the trial court's denial of defendant's request to suppress the out-of-court identification. Having found no error in that issue, we find no error in the trial court allowing the girlfriend to identify defendant in court. See State v. Madison, 109 N.J. 223, 242-43 (1988) (citations omitted) (holding that an in-court identification should be excluded if the out-of-court identification was so impermissibly suggestive that the in-court identification was probably based on the suggestive procedure rather than first-hand observations or if it was otherwise unreliable).

5.    The Sentence

Finally, defendant contends it was error to sentence him to consecutive prison terms for his convictions for murder, kidnapping, and unlawful possession of a weapon. We disagree.

We review sentencing determinations under a deferential standard. State v. Grate, 220 N.J. 317, 337 (2015) (quoting State v. Lawless, 214 N.J. 549, 606 (2013)). We do not substitute our judgment for "the judgment of the sentencing court." Lawless, 214 N.J. at 606 (first citing State v. Cassady, 198 N.J. 165, 180 (2009); then citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). Instead, we will affirm a sentence unless

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Miller, 237 N.J. 15, 28 (2019) (alteration in original) (quoting State v. Fuentes, 217 N.J. 57, 70 (2014)).]

When sentencing a defendant for multiple offenses, "such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence . . . ." N.J.S.A. 2C:44-5(a). In State v. Yarbough, 100 N.J. 627, 643-44 (1985), our Supreme Court established criteria that a sentencing court must consider when deciding whether to impose consecutive sentences. Namely, the court must evaluate whether

> (a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous . . . .

[Id. at 644.]

"The Yarbough factors are qualitative, not quantitative; applying them involves more than merely counting the factors favoring each alternative outcome." State v. Cuff, 239 N.J. 321, 348 (2019) (first citing State v. Molina, 168 N.J. 436, 442-43 (2001); then citing State v. Carey, 168 N.J. 413, 427-28 (2001)).

"When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." State v. Miller, 205 N.J. 109, 129 (2011) (citing Cassady, 198 N.J. at 182). Nevertheless, when a sentencing court fails to explain its decision to impose consecutive sentences a remand is generally required for the judge to provide an explanation on the record. Ibid. (citations omitted).

In sentencing defendant, the court considered the various aggravating and mitigating factors and then found aggravating factors three, six, nine, and

thirteen. N.J.S.A. 2C:44-1(a)(3), (6), (9), (13). The court also found mitigating factor two regarding the kidnaping conviction. N.J.S.A. 2C:44-1(b)(2). The court then balanced those aggravating and mitigating factors and imposed sentences within the ranges for the various convictions.

After defendant filed his appeal, the sentencing judge issued a written memorandum amplifying her reasons for imposing consecutive sentences. The judge explained that she considered the various <u>Yarbough</u> factors and imposed a consecutive sentence for the murder and the kidnapping because those crimes involved separate victims and were independent of each other. In imposing a consecutive sentence for unlawful possession of a firearm, the judge explained that the evidence showed that defendant possessed the gun prior to any contact with the victim.

We discern no error in the consecutive sentences imposed for the murder and the kidnapping. There is evidence supporting the sentencing judge's findings that both crimes were independent of each other and involved two different victims. The consecutive sentence for unlawful possession of a gun is a closer call. While the sentencing judge did not provide a lengthy explanation for imposing consecutive sentences, we cannot conclude that she mistakenly exercised her discretion. The sentencing judge adequately explained that the

unlawful possession of the gun was separate and distinct from the murder. The judge also explained that the evidence showed that defendant possessed the firearm prior to contact with the victim. See Cuff, 239 N.J. at 351; but see State v. Copling, 326 N.J. Super. 417, 441-42 (App. Div. 1999).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION