**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1872-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

HASSAN TODD, a/k/a
ABDUAL TODD, JIHAD
BEAL, JERMAINE COLEY,
QUAMIR WILLIAMS and
HAS,

     Defendant-Appellant.

_____

Argued December 15, 2021 – Decided September 1, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 18-12-4130.

Morgan A. Birck, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Morgan A. Birck, of counsel and on the briefs).

Caitlinn Raimo, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for

respondent (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Caitlinn Raimo, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Following a jury trial, defendant was convicted of first-degree murder, N.J.S.A. 2C:11-3(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1). He was sentenced to an aggregate term of sixty-five years of imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

The convictions stemmed from the fatal shooting of Elijah Roberts and wounding of Tyre Sorbino in front of a Newark pizzeria. Defendant was arrested after two witnesses identified him as the shooter from photo arrays. One of the eyewitnesses, Asya Thomas, Roberts's girlfriend, was with Roberts at the time of the shooting, and knew defendant. Detective Yolanda Holmes, the lead detective, secured surveillance footage of the shooting, interviewed the eyewitnesses, and obtained a search warrant for defendant's aunt's home. The search uncovered a jacket belonging to defendant that matched the one worn by

A-1872-19

the shooter as depicted in the surveillance footage. At trial, both eyewitnesses testified, and Holmes narrated the surveillance footage, identifying defendant as the shooter three separate times and identifying the seized jacket as matching the one worn by defendant in the footage. No forensic evidence or weapon linking defendant to the crimes was presented to the jury.

On appeal, in his counseled brief, defendant raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT ERRED IN DENYING A WADE[1] HEARING.
>
> POINT II
>
> THE JURY INSTRUCTION ON IDENTIFICATION, WHICH OMITTED AN INSTRUCTION REGARDING THE NON-RECORDED CONVERSATION BETWEEN AN EYEWITNESS AND LAW ENFORCEMENT REGARDING THE PHOTO ARRAY PROCEDURE, DID NOT ADEQUATELY EXPLAIN THE RELEVANT FACTORS OF ASSESSING THE RELIABILITY OF THE OUT-OF-COURT IDENTIFICATIONS. (NOT RAISED BELOW).
>
> POINT III
>
> THE LEAD DETECTIVE GAVE IMPROPER LAY-WITNESS OPINION TESTIMONY AS TO CRUCIAL

---

[1] United States v. Wade, 388 U.S. 218 (1967).

A-1872-19

IDENTIFICATION DETAILS. (NOT RAISED BELOW).

POINT IV

THE SENTENCE IS EXCESSIVE AS THE TRIAL COURT FAILED TO FIND A MITIGATING FACTOR SUPPORTED BY CREDIBLE EVIDENCE IN THE RECORD.

In a pro se supplemental brief, defendant makes the following arguments:

POINT I

THE JURY INSTRUCTIONS W[ERE] INADEQUATE AND DEFECTIVE AND DENIED [DEFENDANT] HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL.

POINT II

[DEFENDANT'S] CONVICTIONS SHOULD BE REVERSED BECAUSE [THE] PROSECUTOR IMPROPERLY INFLAMED THE JURY BY TRYING TO GET THE JURY TO SYMPATHIZE WITH THE VICTIM AS [O]PPOSED TO JUST ARGUING THE FACTS OF THE CASE.

POINT III

DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THE IDENTIFICATION PROCEDURE WAS SUGGESTIVELY TAINTED BY THE STATE'S KEY WITNESS BEING TOLD TO REMEMBER THE PHOTO NUMBER THAT DEFENDANT WAS IN PRIOR TO VIEWING THE PHOTO ARRAY.

POINT IV

[DEFENDANT'S] CONVICTIONS MUST BE REVERSED BECAUSE OF THE CUMULATIVE ERROR THAT OCCURRED DURING HIS TRIAL.

Because of the impermissible lay opinion testimony of the lead detective, we reverse the convictions and remand for a new trial.

I.

After defendant's motion for a <u>Wade</u> hearing challenging the admissibility of Thomas's out-of-court identification was denied, a six-day jury trial was conducted in September 2019, during which the State produced twelve witnesses consisting of civilian and law enforcement witnesses, including the eyewitnesses, the surviving victim, a crime scene investigator, a ballistics and firearm identification expert, and the medical examiner. We glean these facts from the trial record.

At approximately 5:45 p.m. on September 22, 2018, an argument occurred on Ridgewood Avenue in Newark between Roberts and another individual. Maryanne Pollard, who knew Roberts from the neighborhood, lived on Ridgewood Avenue and observed the argument from her front porch. Roberts called his girlfriend, Asya Thomas, who came to help calm Roberts down. Thomas and Roberts then walked down the block to Avon Avenue and turned

the corner toward the Brick City Oven pizzeria, at which point Pollard lost sight of them.

A few minutes later, Pollard saw a truck pull up with four people inside. The driver handed the front seat passenger a bag containing a gun, and the passenger, who was wearing a black hooded coat, walked towards the pizzeria. Thomas and Roberts were talking with friends, including Sorbino, in front of the pizzeria when the shooter approached them and shot Roberts in the chest. The gathering immediately dispersed. While hiding behind a wall, Thomas looked out and saw Roberts laying on the pavement as the shooter stood over him and continued to shoot. The shooter eventually retreated behind a parked car, still shooting at Roberts before fleeing.

Once the shooting stopped, Thomas ran to Roberts, but he was unresponsive. Police were alerted by 911 calls and ShotSpotter,[2] and responded along with paramedics. Roberts was later pronounced dead at University Hospital from "[m]ultiple gunshot wounds," having been shot a total of fifteen times. Sorbino, who had been shot in the leg, was treated at the hospital and released. Although Sorbino saw a "black hoodie" prior to the shooting, he could not identify the shooter.

---

[2] The ShotSpotter system alerts officers to a location where shots were fired.

A-1872-19

Detective Yolanda Holmes responded to the scene half an hour after the shooting occurred. Holmes served as the lead detective and, in that capacity, observed the scene, interviewed witnesses, and canvassed the neighborhood for surveillance cameras. After locating surveillance cameras, Holmes viewed and downloaded the footage that depicted the shooting as well as the shooter's initial flight. During the investigation, Holmes reviewed the footage multiple times.

Holmes interviewed Thomas the evening of the shooting and obtained a nickname for the shooter, which Holmes matched to a "government" name. Thomas testified she was familiar with defendant from having seen him "a couple of times." However, when presented with her prior statement to police to refresh her recollection, Thomas acknowledged she had told police she had previously seen defendant "about ten times."

Two days after the shooting, Holmes asked Thomas to participate in a recorded photo array identification procedure, which was conducted by a double-blind administrator.[3] Nine days after the shooting, Holmes arranged for

---

[3] A double-blind administrator is one who does not know who the suspect is or where the suspect's photograph is positioned in the photo array. State v. Henderson, 208 N.J. 208, 248 (2011). The double-blind best practice established in Henderson reduces the possibility that the officer who is administering the identification procedure will suggest to the witness, even unconsciously, which photo in the array depicts the suspect. Id. at 248-49.

Pollard to be administered a recorded double-blind photo array identification procedure. Thomas and Pollard each identified defendant as the shooter from the photo arrays presented to them. Holmes had compiled the photo arrays so that all six photos in each array depicted men with tattoos on their faces, similar to defendant's.

After Thomas's identification, Holmes obtained a search warrant for defendant's aunt's house. During the execution, officers found "a black jacket with a hood" in one of the bedrooms. Defendant's aunt indicated that the jacket belonged to defendant. Holmes believed that the jacket matched the one she had observed in the surveillance footage. After Pollard's identification, defendant was arrested.

At trial, the surveillance footage was played for the jury, with Holmes narrating what it depicted. On three separate occasions during cross-examination, Holmes referred to the shooter in the video by defendant's first and last name, "Hassan Todd." Holmes also testified on direct examination that the jacket seized from defendant's aunt's home was "the same jacket . . . depicted in the surveillance video" "worn by Hassan Todd." The jacket was never tested for DNA or gunshot residue and although law enforcement recovered eight shell casings from the scene that were fired from the same gun, the gun used in the

shooting was never recovered. Additionally, no fingerprints were found at the scene, either on recovered shell casings or parked vehicles.

After the jury returned its verdict, defendant was sentenced to a term of sixty-five years' imprisonment, subject to NERA, on the murder conviction; a concurrent ten-year term, subject to NERA, on the aggravated assault conviction; and a concurrent ten-year term, with a five-year period of parole ineligibility, each on the weapons offenses. A memorializing judgment of conviction was entered on December 5, 2019, and this appeal followed.

II.

In Point III of his counseled brief, defendant argues the lead detective offered "impermissible lay-opinion testimony" which "improperly invaded the jury's role as ultimate fact-finder." According to defendant, "Holmes's opinion" of "whether [defendant] was the shooter in the video and whether the coat in the video was the same as the one recovered from [defendant's aunt's] house" "strayed far beyond the bounds of proper fact testimony by a police officer" and improperly bolstered Thomas's and Pollard's identification testimony.

Because defendant did not object at trial, we apply a plain error standard of review and will reverse only if the errors were "clearly capable of producing an unjust result." R. 2:10-2; see also State v. R.K., 220 N.J. 444, 456 (2015)

(explaining an "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached").  We also recognize that "[a] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment."  State v. Nantambu, 221 N.J. 390, 402 (2015) (quoting State v. Harris, 209 N.J. 431, 439 (2012)).

When the issue has arisen of what is and what is not permissible narration of video footage that captures an incident not witnessed in real time, the question has focused on whether a specific comment by the narrator is purely factual or is a lay opinion.  See State v. Singh, 245 N.J. 1, 14-15 (2021).  Accordingly, the Court has evaluated the admissibility of narration testimony under N.J.R.E. 701.  See State v. Sanchez, 247 N.J. 450, 466 (2021); Singh, 245 N.J. at 14; see also State v. Lazo, 209 N.J. 9, 20-24 (2012).

In Singh, the Court squarely addressed lay opinion testimony relating to video surveillance recordings.  245 N.J. at 4.  The defendant in that case challenged testimony from a detective who had twice referred to the person shown in the surveillance video as "the defendant."  Id. at 18.  The detective further commented that the sneakers worn by the suspect in the surveillance

video looked like sneakers found on defendant the night he was arrested.  Id. at 19.

The Court began its analysis by examining the purpose and boundaries of N.J.R.E. 701, which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.

The Court in Singh determined that it was error for the trial court to allow the detective to refer to the suspect in the video as "the defendant" but ultimately concluded that those fleeting references were harmless.  Id. at 17.  The Court also concluded that there was no error in allowing the detective to testify that the sneakers he saw in the video were like the sneakers the defendant had been wearing on the night he was arrested.  Id. at 17-19.  The Court reasoned that although "the jury may have been able [on its own] to evaluate whether the sneakers were similar to those in the video[, that] does not mean that [the detective's] testimony was unhelpful.  Nor does it mean that [the detective's] testimony usurped the jury's role in comparing the sneakers."  Id. at 20.

11

In Sanchez, the Court focused on whether a parole officer could offer a lay opinion identifying the defendant as a suspect in a still-frame image taken from a surveillance video. 247 N.J. at 458. Specifically, the Court considered whether it was an improper lay opinion for a "parole officer, who had met with [the] defendant more than thirty times as she supervised him on parole, [to tell] a detective investigating a homicide and robbery that [the] defendant was the individual depicted in a photograph derived from surveillance video taken shortly after the crimes." Ibid.

In analyzing that issue, the Court compiled a non-exhaustive list of four factors to consider in determining whether lay opinion testimony will assist the jury in a case. Id. at 473. Those factors include (1) "the nature, duration, and timing of the witness's contacts with the defendant"; (2) "if there has been a change in the defendant's appearance since the offense at issue"; (3) "'whether there are additional witnesses available to identify the defendant at trial'"; and (4) "the quality of the photograph or video recording at issue." Id. at 470-73 (quoting Lazo, 209 N.J. at 23). The Court stressed that no single factor will be dispositive. Id. at 473-74 (citing Lazo, 209 N.J. at 20-24). The Court in Sanchez ultimately determined that the parole officer's testimony was based on her

perceptions of having met with the defendant more than thirty times and, therefore, her testimony was admissible and helpful to the jury. Id. at 475.

Although Lazo did not involve narration of surveillance video footage, the Court considered "whether it was proper for a [detective] to testify at trial about how and why he assembled a photo array" which he showed "to the robbery victim, whose eyewitness identification was the only evidence linking defendant to the offense." 209 N.J. at 12. The Court held that the detective's opinion that defendant's arrest photo was included in the array because it "closely resembled a composite sketch of the assailant" could not "pass muster under Rule 701." Id. at 24. The Court reasoned that the detective "had not witnessed the crime and did not know defendant," and the detective's opinion "was not based on prior knowledge" but "stemmed entirely from the victim's description." Ibid.

The Court further expounded that there was no "change in appearance that the officer could help clarify for the jurors" who "could have compared the photo and the sketch on their own." Ibid. The Court stressed that "[i]n an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant." Ibid. "Neither a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Ibid. The Court concluded that because the identification

was "the sole basis for defendant's conviction," the error in admitting the detective's testimony was not harmless and required reversal of defendant's conviction. Id. at 27.

In State v. Watson, 472 N.J. Super. 381, 404-05 (App. Div. 2022), we recently considered the standard for determining if police video-narrated testimony was properly admitted. After reviewing New Jersey Supreme Court precedent, we held there is no categorical, per se rule that prohibits video narration testimony. Id. at 445. "Rather, the critical fact-sensitive issue to be decided on a case-by-case, indeed, question-by-question basis is whether a specific narration comment is helpful to the jury and does not impermissibly express an opinion on guilt or on an ultimate issue for the jury to decide." Ibid.

In Watson, we distilled general principles related to lay witness opinion testimony and adapted those principles to the specific context of a "play-by-play" narration of video recordings. Id. at 449-450. We recognized certain principles that were already clearly established. For example, we pointed out that existing case law made it "clear that it is impermissible for a police witness to testify at trial as to a defendant's guilt or an ultimate issue to be decided by the jury." Id. at 458. "Relatedly, the law also is clear that there are significant restrictions on when a police witness may offer a lay opinion on whether

14

defendant is the person shown in a video recording or screenshot in cases where the identity of the culprit is at issue." Ibid. We pointed out that an objective description of what is depicted in a video will generally be admissible, but subjective commentary needs to be carefully analyzed. Id. at 463. In that regard, we drew "a fundamental distinction between narration testimony that objectively describes an action or image on the screen (e.g., the robber used his elbow to open the door) and narration testimony that comments on the factual or legal significance of that action or image (e.g., the robber was careful not to leave fingerprints)." Id. at 462.

The critical inquiry in defining the scope of permissible video-narration testimony is the second prong of N.J.R.E. 701: "whether the narration testimony would be helpful to the jury by shedding light on the determination of a disputed factual issue." Id. at 464. "If the jury needs no assistance to fully understand the contents of the video, then narration commentary would tread upon the role of the jury under N.J.R.E. 701 analysis." Ibid. Ultimately, in Watson, we identified six factors to guide trial courts in safeguarding the province of the jury from unwarranted intrusion by narration. Id. at 466. Those factors include: (1) if the video-narration testimony would provide helpful background context; (2) if the testimony would explain the duration of the video and be focused on

15

isolated events or circumstances; (3) if a narrative comment would pertain to a fact in dispute; (4) if a narrative comment would be based on an inference or deduction supported by other facts in evidence; (5) the clarity and resolution of the video recording; and (6) whether the narration testimony would be helpful in focusing the jury's attention if a video is complex or contains distracting images. Id. at 466-69.

Here, for much of her testimony, Holmes referred to the individual depicted in the surveillance video and still-frame images from the video as "the shooter." However, on four separate occasions, Holmes identified the shooter in the surveillance video as defendant, "Hassan Todd." First, when the prosecutor questioned Holmes about the black hooded jacket she seized while executing a warrant at defendant's aunt's house, the following ensued:

> [PROSECUTOR]: Okay, and how do you recognize that black jacket?
>
> [HOLMES]: That's the same jacket matching the description depicted in the surveillance video --
>
> [PROSECUTOR]: Okay, is that --
>
> [HOLMES]: -- worn by Hassan Todd.
>
> [PROSECUTOR]: Is that the jacket that you seized from [defendant's aunt's home]?
>
> [HOLMES]: Yes.

During cross-examination, when questioned about Thomas's location in relation to the shooter, while the surveillance video played, Holmes explained:

> [HOLMES]: [Thomas] stops, right behind this red sign right here. There's a . . . little corner. She stops there for a second and she looks at Hassan Todd.
>
> [DEFENSE COUNSEL]: Well --
>
> [HOLMES]: Then she continues running.

When defense counsel continued to probe Holmes on Thomas's location in relation to the shooter, Holmes again responded: "when [Thomas] got to the top of MLK, Hassan Todd was still shooting." Later, still disagreeing with defense counsel's characterization of Thomas's ability to identify the shooter based on her location, Holmes noted:

> And keep in mind . . . Hassan Todd was not wearing the hood over his head when he approached the corner. When he . . . stopped shooting and was going back, running, that's when in the video you will see he [puts the hood up]. So everyone has a clear view of his face.

Holmes's references to the shooter as "Hassan Todd" clearly constitutes impermissible lay opinion testimony. The testimony violates N.J.R.E. 701's prescriptions because Holmes's testimony that the shooter in the video was defendant was not "rationally based" on Holmes's own "perception" as N.J.R.E. 701 requires. Holmes was not present at the scene when the shooting occurred,

did not witness the incident firsthand, and did not know defendant. Holmes first viewed the incident on surveillance footage afterwards. Critically, her opinion about the shooter's identity was not based on any prior knowledge of defendant but stemmed from Thomas's and Pollard's identification of defendant. As a result, Holmes's opinion testimony improperly bolstered the eyewitnesses' credibility and impermissibly expressed an opinion on the identity of the shooter. Holmes's testimony also failed to comport with N.J.R.E. 701 because the jury was just as competent as Holmes to form a conclusion about the identity of the shooter in the video. Given the absence of any evidence in the record of a change in appearance, the jury needed no assistance to determine whether the shooter in the video was in fact defendant and whether defendant wore the seized jacket in the footage. Holmes's testimony therefore invaded the province of the jury as the ultimate trier of fact.

The Singh Court found that admission of two "fleeting" references to "defendant," which "appear[ed] to have resulted from a slip of the tongue" in narrating the surveillance video, did not amount to plain error. 245 N.J. at 18. Here, Holmes's references were neither fleeting nor a slip of the tongue. The Singh Court also determined that the "testimony regarding the sneakers was proper" because the detective "had first-hand knowledge of what the sneakers

looked like because he saw defendant wearing them on the night of his arrest." Id. at 5. Here, Holmes had no first-hand knowledge of defendant wearing the jacket.

Because defendant did not object to the testimony, we must determine whether the errors were "clearly capable of producing an unjust result" to warrant reversal. R. 2:10-2. In deciding whether reversal was warranted in Singh, the Court evaluated "'the overall strength of the State's case.'" 245 N.J. at 13 (quoting State v. Sanchez-Medina, 231 N.J. 452, 468 (2018)). There, the officers apprehended the defendant shortly after the robbery occurred and observed defendant dropping a machete – the robbery weapon – and the robbery proceeds while fleeing. Id. at 18. Although the Court concluded that the error withstood plain error scrutiny given the "significant" "circumstantial evidence of the robber's identification," the Court stressed "that in similar narrative situations, a reference to 'defendant,' which can be interpreted to imply a defendant's guilt . . . should be avoided in favor of neutral, purely descriptive terminology such as 'the suspect' or 'a person.'" Ibid.

Here, the State's case rested on Thomas's and Pollard's identifications and eyewitness testimony, the black jacket, and the surveillance footage. Notably, three of Holmes's four references to defendant as the shooter came during a

contentious back-and-forth with defense counsel about the ability of Thomas to obtain a clear view of the shooter.  There was no weapon recovered, no forensic evidence, and no ballistics evidence tying defendant to the crime.  As the judge noted, "[t]he identification of the person who shot the deceased is the crux of the case."  Because the State's case hinged on identification, we are satisfied that the repeated improper bolstering of the credibility of the identification testimony by the lead detective assigned to investigate the case was clearly capable of producing an unjust result.  R. 2:10-2.  Thus, we are constrained to reverse the convictions and remand for a new trial.

Based on our decision, we need not address defendant's remaining arguments.  However, for the sake of completeness, we briefly address defendant's contention that he was entitled to a Wade hearing based on Thomas's remarks during the photo identification procedure and law enforcement's failure to comply with Rule 3:11(c)(10) in conducting the identification procedure, both of which demonstrated suggestiveness that may have tainted the identification.

It is undisputed that when she was first shown the photo array, Thomas exclaimed:  "Oh God, they told me to remember the number of the picture."  In admitting the identification testimony and denying defendant's request for a hearing, the trial judge acknowledged that the statement was "a little odd"

because "she was told to remember the number of one of the photos." Nonetheless, the judge concluded that the "statement in a vacuum does not, in this [c]ourt's estimation warrant a full hearing." The judge noted there was nothing "to suggest that [Thomas] was somehow told to identify a particular number, or a particular photo." Instead, in assessing the reliability of her identification testimony, the judge relied heavily on the fact that Thomas knew defendant.

The double-blind administrator conducting the identification procedure did not ask Thomas to explain who she spoke to or why she was told to remember a number. At trial, Thomas confirmed that she had spoken to Holmes prior to the identification procedure. Holmes also testified that she spoke with Thomas about the procedure before her identification. Despite the clear showing that a conversation occurred between Thomas and Holmes about the identification procedure before it was administered, there was no recording or account of that interaction as prescribed under Rule 3:11(c)(10), requiring law enforcement officers to record "the identity of any individuals with whom the witness has spoken about the identification procedure, at any time before, during, or after the official identification procedure, and a detailed summary of what was said."

A-1872-19

The Henderson Court "held that when defendants can show some evidence of suggestiveness tied to a system variable, they are entitled to explore all relevant system and estimator variables at a pretrial hearing to try to challenge the admissibility of the identification." State v. Anthony, 237 N.J. 213, 226 (2019) (citing Henderson, 208 N.J. at 288-93). In Anthony, the Court "modif[ied] the Henderson framework" to make clear that "a defendant will be entitled to a pretrial hearing on the admissibility of identification evidence if . . . Rule 3:11 [is] not followed and no electronic or contemporaneous, verbatim written recording of the identification procedure is prepared." 237 N.J. at 233. "[D]efendants need not offer proof of suggestiveness in order to obtain this remedy." State v. Guerino, 464 N.J. Super. 589, 619 (App. Div. 2020) (citing Anthony, 237 N.J. at 233-34). Law enforcement's inability to provide the information "should not deprive defendants of the opportunity to probe about suggestive behavior that may have tainted an identification." Anthony, 237 N.J. at 233. Here, because Rule 3:11(c)(10) was not followed, we agree that defendant presented sufficient evidence to justify a Wade hearing. However, we express no view on the outcome of the hearing.

Our disposition does not require us to address defendant's sentencing arguments.

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1872-19